[Criminal No. 526. Filed July 29, 1922.]

[208 Pac. 412.]

# THEODORE WEST, Appellant, v. STATE, Respondent.

1. CRIMINAL LAW—FAILURE TO SUBMIT FORM OF VERDICT DOES NOT REQUIRE REVERSAL UNLESS PREJUDICIAL.—Even though the court should submit as many forms of verdict as the facts would permit to be returned if he submits any, his failure to submit a particular form of verdict does not require a reversal, unless it appears that the omission prejudiced in some way the rights of defendant.

2. CRIMINAL LAW—FAILURE TO SUBMIT FORM OF VERDICT FOR ACQUITTAL ON GROUND OF INSANITY IS NOT PREJUDICIAL TO ACCUSED.—Where the court instructed the jury that if they found defendant insane they should return a verdict of not guilty, and submitted, among other forms for verdict, a form of verdict simply finding defendant not guilty, its failure to submit a form finding defendant not guilty on the ground of insanity was not prejudicial to accused, since the reason for requiring such verdict is that the court may take further steps to restrain and confine defendant, as provided in Penal Code of 1913, section 1100, so that it is not for the benefit of accused, and it cannot be supposed that if the jury had found him to be insane they would have refused to return a verdict of not guilty under the instructions because of the failure to submit the other form.

3. CRIMINAL LAW—STATUTE PERMITTING USE OF FORMER TESTIMONY OF WITNESS, IF DEAD OR INSANE, DOES NOT APPLY TO TESTIMONY OF ACCUSED.—Penal Code of 1913, section 881, subdivision 7, permitting the use of former testimony upon any subsequent trial of defendant for the same offense, either on behalf of the state or for the defendant, on showing that the witness is dead or insane, does not apply to the testimony of accused at the preliminary examination, so as to exclude it in the absence of proof of his death or insanity, since manifestly if such proof were made the defendant would not be on trial, but is limited to the testimony of witnesses other than accused.

4. CRIMINAL LAW—INSISTENCE ENTIRE TRANSCRIPT BE READ WAIVES OBJECTION TO THAT MEANS OF PROVING ADMISSIONS OF ACCUSED.—Where the defendant's testimony at the preliminary examination was offered by the state as an admission or confession, an insistence by defendant's counsel that the whole transcript be read, and not a portion of it, waived any objection that might otherwise have been made as to that manner of proving defendant's admissions and confessions.

5. CRIMINAL LAW—VOLUNTARY CONFESSION OR ADMISSION OF ACCUSED IS ADMISSIBLE AGAINST HIM.—Any statements made by defendant prior to the trial, having the effect of an admission connecting him with the act, or a confession of the crime, whether judicial or extrajudicial, if voluntarily made, may be used by the state as original evidence upon defendant's trial, so that admissions in defendant's testimony at the preliminary examination are competent on behalf of the state after proof they were voluntarily made.

6. WITNESSES—ACCUSED AS WITNESS CAN BE IMPEACHED BY PROOF OF CONVICTION OF OTHER FELONIES.—Under Penal Code of 1913, section 1229, permitting a defendant to be a witness in his own behalf and subjecting him to cross-examination subject to the same rules as any other witness, a defendant who goes upon the stand may be impeached by proper evidence of convictions for former felonies.

7. WITNESSES — EVIDENCE IDENTIFYING ACCUSED WITH PERSON CONVICTED UNDER ANOTHER NAME IS COMPETENT.—Where defendant on cross-examination denied he had been convicted more than once, evidence on behalf of the state, identifying defendant as the one who had been convicted on other occasions under different names, if otherwise competent, was admissible.

8. WITNESSES—PRISON RECORDS OF ACCUSED HELD INADMISSIBLE TO IMPEACH.—Even though accused denied previous convictions, evidence of his prison record under such convictions had no tendency to identify him as the individual convicted, and a letter from prison officials, transmitting records, photographs and fingerprints, which would have aided in identification, was hearsay, so that the admission of such evidence was plainly error.

9. CRIMINAL LAW—ERRONEOUS ADMISSION OF IMPEACHING EVIDENCE DOES NOT REQUIRE REVERSAL, UNLESS INJUSTICE HAS BEEN DONE.—Even though manifest error was committed in the admission of defendant's prison record under previous convictions for the purpose of impeaching his testimony, the admission of such evidence does not require a reversal, unless such error resulted in a miscarriage of justice under Constitution, article 6, section 22, and Penal Code of 1913, section 1170, prohibiting reversal in any criminal case for technical error when, upon the whole record, it appears that substantial justice has been done.

5. Admissibility in criminal prosecution of evidence given by defendant before coroner, see notes in 3 **Ann. Cas.** 517; 12 **Ann. Cas.** 161.

6, 7, 8. Method of proving conviction of crime in order to impeach defendant in criminal case as witness, see notes in 13 **Ann. Cas.** 643; **Ann. Cas.** 1914C, 256.

10. Criminal Law — Evidence Clearly Excluding Every Defense but Insanity Shows Erroneous Impeaching Evidence was not Prejudicial.—Where the evidence in a prosecution for murder clearly showed that defendant committed the homicide under circumstances which excluded every possible defense except that of insanity, the erroneous admission of the prison record of defendant under previous convictions does not require a reversal, since on the issue of insanity the admission of such evidence was probably beneficial.

11. Homicide — Circumstantial Evidence Held to Sustain Conviction for Murder With Death Penalty.—Where the circumstantial evidence, in connection with defendant's inconsistent statements, clearly excluded every hypothesis except that he was the guilty party, and excluded every defense except insanity, as to which the only evidence was that defendant had previously been confined in an insane asylum from which he had been discharged as cured, a verdict, finding defendant guilty and assessing the death penalty was not contrary to the evidence.

APPEAL from a judgment of the Superior Court of the County of Mohave. E. Elmo Bollinger, Judge. Affirmed.

Mr. Harold Baxter, for Appellant.

Mr. John M. Hines, Jr., County Attorney, and Mr. W. J. Galbraith, Attorney General, for the State.

ROSS, C. J.—The appellant, Theodore West, whom we shall refer to as the defendant, was tried and convicted of murdering one Lem Smith, in Mohave county, Arizona, on the twenty-third day of July, 1921. The verdict imposed the death penalty. From an order overruling a motion for new trial and the judgment and sentence of the court, he appeals.

The salient facts disclosed by the record are as follows:

On the morning of July 24, 1921, on the left of the road going south and west from Oatman to Topoc, in Mohave county, the dead body of Lem Smith was found. He had been shot from behind. The bullet entering at the hair line of his neck, had ranged forward and a little downward, severing the spinal cord

at the point where it emerges from the skull, and had passed out on the left just below the jawbone. His cap was badly powder-burned where the bullet passed through, showing that he had been shot at close range. About 100 feet east of the place where the body was found were tracks, indicating that an automobile had swerved from the road and run out of the traveled road, but near, and in the same general course, for about 160 feet, when it got back into the road. Blood stains along the track indicated that the hind left wheel had run over the deceased after he had been thrown or had fallen from the car. Deceased's cap was found in the road near where the automobile first diverged from the road.

The evidence further discloses that deceased and defendant, some time in July, left Brownwood, Texas, together in a Ford touring car belonging to the deceased; the latter's destination being Washington state, and the defendant's Southern California. At Magdalena, New Mexico, on July 15th, they met up with two families, G. E. Holdridge, wife and children, and E. A. Southwick, wife and children, traveling by automobile to Los Angeles. From that point to Williams, Arizona, the deceased and defendant traveled, and frequently camped, with the Holdridges and Southwicks. The latter detoured from Williams to the Grand Canyon, and defendant and deceased traveled alone to Kingman, arriving at the latter place on July 22d, where they were detained on account of automobile troubles until about 4 P. M. of the 23d. While in Kingman deceased received by wire $100. He also traded a shotgun that he had for a 33–20 Colt's revolver. Cartridges were bought in Kingman for this revolver. Before the deceased and defendant left Kingman the Holdridges and Southwicks had arrived and interchanged greetings with them. Leaving Kingman, after the middle of the afternoon, they arrived at Oatman, twenty-eight miles

out, where they went to a restaurant for supper. So far as the evidence shows this was the last time and place Smith was ever seen alive, except by the person or persons who murdered him. It was near 6 o'clock P. M. when they left Oatman, going on the regularly traveled road toward California, on which road eleven miles east of Topoc, on the following morning, Smith's dead body was found.

On July 26th defendant was arrested by a policeman on the streets of Los Angeles, and turned over to the sheriff of Los Angeles county. But before his arrest, and a short time after he arrived in Los Angeles, he went to the American Express office and got a suitcase and bag that he had expressed from Ludlow, California, to Theodore West, Los Angeles, and had taken them to a lodging-house where he engaged a room and there changed his clothes. When first questioned after his arrest he denied having any suitcases, and denied that he had changed his clothes. He was taken to the American Express office, and recognized by the agent as the person who had earlier called for the suitcase and bag. From a source other than himself the officers who had him in charge learned the location of the lodging-house where he had engaged a room. With defendant the officers went to this room and there found the suitcase and bag, and, among others, the following articles of personal property that had formerly belonged to the deceased: A revolver (the one traded at Kingman) and some cartridges, a camera, a watch, a $5 war-saving stamp bearing Lem Smith's name, a purse with some paper money in it, blood-stained, parts of envelopes and letters torn up and thrown into a cuspidor, one of which was from a brother of deceased. There was also found a blood-stained shirt and trousers. When asked as to how he came into the possession of the articles belonging to the deceased, he said he had bought them from Smith from time to time, on the

24 Ariz.—16

trip. J. N. Nolan, deputy sheriff for Los Angeles county, who was present during this time testified:

"He then told the story regarding the killing of Smith. He said he was riding along the road and was asleep in the back seat, head resting on the black grip. He felt as though someone was at his back, and he woke up startled, pulled his revolver from under the grip, cocked it, and shot. He said he heard some noises; someone was trying to hold him up. He said the machine ran down an incline, struck the bank and turned over, and that the body of Smith was thrown out and under the machine, under one of the hind wheels. He said he tried to release the body from under the machine, but he did not have strength enough to do it. He waited a few minutes and sat on the running-board of the machine, and nobody came along. He said that he picked up his two grips, black hand-bag, and the other one, and started to walk across the desert. He thought he had walked 4 or 5 miles, and there three young men came along in a machine and gave him a ride. They took him to a railroad crossing, and there was a freight train there. He told them to take his baggage into Ludlow, California, and he would go in there on the freight train. He said he gave the conductor $2 to carry him in, and the freight train arrived about the same time the machine did with his baggage. Then at the door he heard some noises, and he recognized the three young men who carried his baggage, and he went over to them and asked them to give him the baggage."

W. P. Mahoney, sheriff of Mohave county, relates a confession made by defendant in Los Angeles, as follows:

"It was a conversation, I think, between Detective Nolan and West, in which West says he killed Lem Smith. Then he shaded that, and he said, 'I killed Lem Smith, but I didn't know what I was doing; I was excited.' Then I think it was that Detective Fox asked, 'What were you excited about?' 'Well,' he said, 'I woke up suddenly, and Smith had his hand on my cheek here, through the back seat, and he was shaking me, and I thought Smith was going to rob me.' That was his first conversation. He says, 'I

had my gun under my black hand-bag.' He says, 'I pulled up the gun, and when I was pulling it up I capped [cocked] it, and I must have shot Mr. Smith.' He says, 'I didn't intend to do it.' . . . He also said that he left Smith's body in Smith's car, and had started out afoot. He walked about 8 miles until he was picked up by these three men in a Ford car. He also told me, or told all of us there that were in the room, that he paid the conductor $3 to carry him from Danby to Ludlow, $2 or $3. . . . He made rambling statements all the time.''

Later, at the preliminary trial, and before, defendant stated, in substance, that he had fallen asleep in the back seat of the car, and suddenly was aroused by someone pulling at his clothes and hollering in a loud voice, "All right; all right"; that in his excitement he reached for the revolver, and while struggling with one of his assailants discharged it; that at the time he saw two men, one on the footboard on each side of the car; that he did not know as a fact whether or not he had shot Smith; that the men who had awakened him held him in duress, and by threatening his life had forced him to go on with them and conceal the details of the incident; that these three men had robbed him of his money and diamonds, and had passed to him all incriminating evidence that they did not want to be hampered with, including the bloody money.

The three men referred to by defendant were L. L. Hawkins, D. F. Hawkins and E. A. Corbell, also traveling in a Ford touring car from Electra, Texas, to Taft, California. They were all witnesses at the trial and their testimony, was, in substance, as follows: They arrived in Kingman July 23d, at about 4 o'clock, remaining there thirty minutes, passed through Oatman about 7:30—one man, the driver, was riding in the front seat, and two were riding in the back seat. As they were going along the road, about 8:30 or 9 o'clock, the two men in the back seat "saw something

beside of the road that did not look right," and as they proceeded they talked among themselves as to whether they should go back and see what it was. They concluded that it might be a hold-up and went on. About two miles farther on they found defendant West with a Ford car, stuck in a hole, and at his request they assisted him in getting the car started. Defendant explained to them that he had been driving all day and was tired, that he had been stuck in that hole a couple of hours and was played out, and he asked one of them to drive his car. L. L. Hawkins drove the Smith car, the defendant riding with him, and the other Hawkins and Corbell occupied the other car from that point on through the Needles and until the Smith car broke down. Hawkins mentioned to the defendant that he had seen something that looked like a man lying by the side of the road and the defendant answered: "Probably a tramp; lots of them in the country."

The two cars arrived at the Needles about 11:15 or 11:30 P. M., and the Smith car's lights, that had failed, were adjusted at a service station. Two or three persons, who were at the garage, were witnesses at the trial. They testified that there was blood on the left side of the car and the footboard; that defendant threw two or three buckets of water on to the car, stating that "Lizzie" needed water. They were there but a short time, when they proceeded west toward Los Angeles, in the same way that they had traveled before; L. L. Hawkins driving the Smith car. About 2 o'clock, and within a mile of the town of Danby, a station on the Santa Fe, the rear right hub of the Smith car became stripped and would not function. The Hawkinses and Corbell had an extra hub, and offered to let defendant have it to fix his car, but the defendant said he was tired and sleepy and would rather go on and leave it, and later have it hauled in from Barstow. The Smith car was there-

upon placed to the right-hand side of the road, and partly covered, by defendant, with a blanket. Defendant transferred therefrom a suitcase, a handbag, and a camera. Before doing this he transferred some stuff from one hand-bag to another, and left the empty one in the Smith car, together with the bedrolls and some other things. From there defendant rode with the Hawkinses and Corbell as far as Ludlow, where they arrived about 7:30 or 8 o'clock, and two of them went to breakfast with defendant, while the other worked on the car; the defendant paying for the breakfast. Defendant, at Ludlow, took his grip and hand-bag and the revolver from the Hawkins automobile, and stated that he would go by train to Barstow; that he had a friend there whom he wanted to see. That was the last time the Hawkinses and Corbell saw defendant, until the preliminary examination, where they appeared as witnesses.

Later in the day, about 12 o'clock, the Holdridge family reached Ludlow; the Southwick family, on account of car trouble, having stopped at Goff. Mr. Holdridge testified that while they were eating lunch, at a garage in Ludlow, the defendant came up to them, and this conversation was had:

"I says, 'Hello, Mr. West,' I says, 'Where is Mr. Smith?' and Mr. West says, 'I left him in Kingman.' He says, 'Mr. Smith got a job in Kingman in a mine.' We was talking on, and I asked him how he got there, and he told me he met a friend in Kingman that wanted him to go to Ludlow with him and go out and look at a mine."

The defendant then asked Holdridge to give him a ride into Los Angeles, and was told by the latter that he could ride, but that they were heavily loaded and could not take his baggage. The defendant went to the depot, stating he would express his baggage, and return in a few minutes. On his return he got into one of the Holdridge cars, and was driven from Lud-

low into Los Angeles, arriving there on the morning of the 25th about 8 o'clock.

J. M. Shaw, deputy sheriff of Mohave county, went to Danby and drove the Smith car back to Kingman. He testified:

"The front seat was bloody. There was blood on the wheel, blood on the rear fender, blood on the running board."

There was blood also on the casing of the left hind wheel. There was a brown piece of canvas covering the blood on the seat. A blanket had been so tied on the left side of the car as to cover that side, including the footboard and the fenders.

Other facts will be stated as necessary in the discussion of the assignments of error which are as follows:

"(1) The court erred in instructing the jury that if they should find the defendant was insane at the time of the commission of the alleged crime they should bring in a verdict of 'Not guilty.'

"(2) . . . In failing and neglecting to furnish the jury with a form of verdict of 'Not guilty by reason of insanity.'

"(3) . . . In allowing the reading, over defendant's objection, of the transcript of the testimony of defendant, given at the preliminary examination.

"(4) . . . In allowing the introduction and reading, over defendant's objection, of the various certified copies of judgments, prison records, photographs, and finger-prints from various courts, officials, and prison officials of the state of California, and of the state of Texas, and in the reading and introduction as evidence, of cumulative matters relating to alleged offenses purporting to have been committed in said states of California and Texas.

"(5) The verdict is contrary to the law.

"(6) The verdict is contrary to the evidence."

We will take the assignments up in the order given, treating the first two as one, since they are of the same nature.

The court's instructions on the question of defendant's insanity seemed to have been satisfactory to the defendant, as he makes no complaint on that account, and the same is true of the instructions as a whole. After the court had fully advised the jury as to the law of the case covering all questions and issues involved, he announced that five forms of verdict would be submitted to them for their consideration, and stated the distinguishing facts applicable to each. The forms so submitted called for verdicts as follows: (1) Murder of the first degree; penalty, death. (2) Murder of the first degree; penalty, life imprisonment. (3) Murder of the second degree. (4) Manslaughter. (5) Not guilty. In connection with the last form of verdict the court used this language:

"But if the offense as charged in the information has not been proven to your minds beyond a reasonable doubt as having been committed by this defendant, or if you believe by the preponderance of the evidence that he was insane at the time of the alleged offense, or if you believe that this alleged tragedy occurred by reason of accident and misfortune and without any criminal intent, or if you have a reasonable doubt as to whether or not the alleged offense occurred in such manner, then it will be your duty to acquit the defendant, in which event you will say in your verdict: 'We the jury, duly impaneled and sworn in the above-entitled action, upon our oaths, do find the defendant, Theodore West, not guilty.' "

It is claimed that because section 1084 of the Penal Code provides that, "when the defendant is acquitted on the ground that he was insane at the time of the commission of the act charged, the verdict must be 'not guilty by reason of insanity,' " a form of verdict incorporating that idea should also have been submitted to the jury, and a failure to do so was error; also that it was error to tell the jury that, if they found defendant insane at the time the act was committed, they should return a verdict of "not guilty."

While the law does not make it the duty of the court to submit forms of verdict to the jury, it may be conceded, when he does do so, he should submit as many forms as the facts of the case would permit to be returned. But, before a failure to do so could be made the basis of reversible error, it must be made to appear that the omission prejudiced in some way the rights of the defendant.

The reason for requiring the verdict, where the acquittal is on account of insanity, to so state, is that the court may take further steps to restrain and confine the defendant as provided in section 1100 of the Penal Code. It is not for the benefit of the accused, but that society may be protected. If the jury is made to know, as it was in this case, that the defendant should be found not guilty, if insane at the time the act was committed, it is not to be supposed that, having found that to be his condition, the jury would have been less willing to return such a verdict than one stating "not guilty by reason of insanity." Doubtless the question with the jury was whether the defendant was sane or insane at the time he committed the act, and if the jury concluded he was insane it would have followed the direction of the court by returning a verdict of "not guilty," a more favorable verdict than he would have been entitled to. The instructions of the court could leave no doubt in the minds of the jury as to its power and duty in case it found the defendant insane, but in addition to that all the jurors on their *voir dire* were informed that insanity would be an issue, and each of them stated, under oath, he would follow the court's instructions thereon. The defendant's industrious and able counsel has failed to cite us to any authority for his position that the court erred to the injury of the defendant, in advising the jury to return a verdict of "not guilty" if it believed he was insane, when he committed the act, or in failing to submit the form of ver-

dict "not guilty by reason of insanity." The only case cited that remotely bears upon it is *State* v. *Crowe,* 39 Mont. 174, 18 Ann. Cas. 643, 102 Pac. 579. In that case, under a statute like our section 1084, *supra,* as to the form of verdict in insanity cases, the court informed the jury it might find either of four verdicts:

"(1) Guilty of assault in the first degree; (2) guilty of assault in the second degree; (3) guilty of assault in the third degree; (4) not guilty."

The court said:

"This instruction is not accurate," and that "the jury should have been told that they might find the defendant not guilty by reason of insanity."

The Crowe case was reversed, but on another question, and we do not construe the court's language, commenting upon the forms of verdict, as bearing the construction or meaning that prejudicial error had been committed. As heretofore intimated, we think the instruction in the present case, in reference to the forms of verdict, might well be criticised as "not accurate." But, under our liberal practice, we are not permitted to reverse cases for mere inaccuracy of instructions.

The argument under the next assignment (3) is that, since defendant's testimony was taken at his preliminary, it could only be used at the trial of defendant, when it was shown that he was dead or insane. This contention is predicated upon subdivision 7 of section 881 of the Penal Code, which reads as follows:

"The defendant or his counsel and counsel appearing for the state shall have the right to cross-examine the witness, and such deposition or testimony, when taken as provided for in these paragraphs, may be read upon any subsequent trial of such defendant for the offense for which he is held, either on behalf of the state or for the defendant, upon its being satisfac-

torily shown to the court that the witness who made such deposition is dead, or insane. . . . ''

The trial court ruled that this provision had no application to the testimony of a defendant in a preliminary trial, and we are well satisfied he was right. Our sections 753 and 881 were evidently compiled from, and were intended to prescribe, the same rule of evidence as is provided for in sections 686 and 869, Kerr's Penal Code of California. In *People* v. *Thourwald,* 46 Cal. App. 261, 189 Pac. 124, 126, it was contended by the appellant:

"That the testimony given by the accused at the preliminary hearing of the charge could not, in any event, be admissible in evidence at the trial of the accused, except under the conditions set forth in subdivision 3 of section 686 of the Penal Code, and that the conditions rendering the testimony admissible were not shown to exist in this case—to the contrary, they were, it is said, shown not to exist.''

The court in passing upon the question said:

"The testimony of the defendant in this case was obviously not admitted upon the theory upon which said section is framed, nor, obviously, could it be. That section has reference entirely to witnesses in a criminal case other than the defendant, who, of course, could not be put upon his trial for a felony in his absence or if he were insane.''

The defendant's testimony at the preliminary was offered by the state, as "a statement or admission or confession of the defendant,'' after proof that it was voluntarily and freely given, and when the court ruled that admissions and confessions made under such circumstances were admissible, defendant's counsel said:

"At this time we insist that the whole transcript be read, and not a portion of it.''

This consent to the reading of the whole transcript of defendant's testimony waived any legal objections

that might otherwise have existed as to the manner of proving defendant's admissions and confessions. It is well settled that any statements made by a defendant prior to his trial, having the effect of an admission, connecting him with the act, and likewise a confession that he committed the act, whether judicial or extrajudicial, if made without coercion, duress, or hope of reward, may be used by the state in evidence as a part of its original case upon the defendant's trial for the offense charged. 16 C. J., p. 626, § 1243; p. 630, §§ 1251, 1253; p. 730, §§ 1501, 1502; *Tiner* v. *State,* 110 Ark. 251, 161 S. W. 195; note to *State* v. *Clifford,* 41 Am. St. Rep. 522 (86 Iowa, 550, 53 N .W. 299); *People* v. *Kelley,* 47 Cal. 125.

This brings us to the fourth assignment of error. The defendant on cross-examination admitted that he had been convicted of a felony in the courts of Texas, and had served a term of about three months in the penitentiary of that state. He was further cross-examined concerning other felonies and convictions thereof in the state of Texas and in the state of California. He denied ever having been convicted of any felony other than the one in Texas, and denied ever having been sentenced to the penitentiary of Texas or California for any offense other than the one admitted. The prosecution thereafter offered, for the purposes of impeachment, certified copies of judgments of conviction of the defendant in the states of Texas and California. The convictions and imprisonments in Texas were for the felonies of horse theft, hog theft, forgery, and passing forged instruments, and in California for grand larceny and murder.

Under section 1229 of the Penal Code a defendant may be a witness in his own behalf, and when he does become a witness he may be cross-examined to the same extent and subject to the same rules as any other witness. This places the defendant, testifying in his own behalf, in the same category as any other

witness. By the statute he is given an opportunity to testify, and if he accepts it he must submit to the same rigid cross-examination as other witnesses. If his past life has been spent behind prison bars, for felonies he has committed, his taking the stand opens the way to the prosecution to exhibit, by proper evidence, that past life, to the jury, as bearing upon the weight and credit to be given his testimony. In other words, the jury can be shown the convictions and imprisonments for the purpose of impeaching the defendant as a witness. 2 Wigmore on Evidence, §§ 980, 987, 1003; 5 Jones' Commentaries on Evidence, § 839; *Prather* v. *State,* 14 Okl. Cr. 327, 170 Pac. 1176; *State* v. *Wilson,* 108 Kan. 433, 195 Pac. 618; note, 6 A. L. R. 1609, 1635; 1 Wharton on Criminal Evidence, p. 903, § 429. The defendant was tried and convicted in the California courts under the name of Robert McIntosh and Robert B. McIntosh, *alias* William Dean West, in Texas under the name of W. T. West, *alias* W. A. West. A witness, Dr. Donald R. Smith, testifying, identified the defendant, Theodore West, as being the same person as Robert McIntosh, who was tried and convicted of grand larceny and murder in San Diego county, California. If we understand the defendant's counsel correctly, he does not take serious exceptions to the introduction of the certified copies of the judgments of conviction in California and Texas, nor to the testimony of the witness Donald R. Smith, identifying the defendant, Theodore West, with Robert B. McIntosh, but he does contend that the court committed error in permitting the prosecution to introduce before the jury, the defendant's—

"prison records, phonographs, and finger-prints from various courts, officials, and prison officials of the state of California and the state of Texas, and in the reading and introduction as evidence of cumulative matters relating to alleged offenses purporting to have

been committed in said states of California and Texas."

The defendant having denied the various convictions in the courts of Texas and California, it became necessary for the prosecution to show that he was the same person described in the judgments of conviction as W. T. West, *alias* W. A. West, *alias* Robert B. McIntosh, and *alias* William Dean West. We cannot see how the defendant's "prison records" could aid the jury in determining those questions. The photographs and finger-prints offered in evidence, when properly identified or proven, might have assisted the jury in that regard. The letters from prison officials to the county attorney of Mohave county, transmitting records, photographs and finger-prints, were the merest hearsay, and we cannot understand why the county attorney should have offered them or the court permitted them to be read to the jury. They were not official documents, and if they were their contents were inadmissible for any purpose. Just why county attorneys will, in the prosecution of criminal cases, insist upon getting into the record, as evidence, things that are clearly not evidence, especially in a case wherein the evidence of guilt of the defendant is overwhelming, it is very difficult to understand. Their position should be to see that neither the rights of the people nor the defendant are outraged, and they should be as unwilling to permit improper and irrelevant testimony against a defendant as to see one guilty of crime go unpunished.

In this case if the evidence of the defendant's guilt was close or any way nearly evenly balanced, the court would feel bound to reverse the judgment of conviction and order a new trial, because of the introduction of immaterial, incompetent and irrelevant evidence. The court properly admitted the certified copies of the judgments of conviction, and properly admitted competent evidence to identify the defendant

as the same person who had suffered convictions in California and Texas. That far, and no further, should the evidence have gone. It was all for the purpose of impeachment, and under the rules of evidence, as we understand it, the evidence should be confined to the fact of conviction and imprisonment, which may be brought out either upon cross-examination of defendant or by introducing the records of conviction. *People* v. *Chin Mook Sow*, 51 Cal. 597.

However, from the whole record, we are convinced that the error in admitting the prison record and letters from prison officials, transmitting photographs, finger-prints and prison records, was not prejudicial to the defendant's rights. The legislature of this state, in section 1170 of the Penal Code, announces as a guide for this court the following very salutary and common-sense rule:

"After hearing the appeal, the court shall give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties, and no judgment in any criminal case shall be reversed for technical error in pleading or proceedings when upon the whole case it appears that substantial justice has been done."

This rule is a restatement of section 22, article 6, of the Constitution. We have said in *Birch* v. *State*, 19 Ariz. 366, 171 Pac. 135:

"Cases may be reversed in this court only where the record affirmatively shows error prejudicial to some substantial right of a defendant."

And in *Bush* v. *State*, 19 Ariz. 195, 168 Pac. 508, we said:

"We are persuaded that had the record been free of the error suggested for reversal the verdict of the jury would not have been otherwise"

—and refused to reverse the case for that reason. The tendency of legislation and judicial decision in

recent years has been to require of a defendant, complaining of his conviction, to show that some right of his has been prejudiced, before setting aside a conviction. The effort is not to disregard his guaranties under the law and Constitution, but to strip the trial of all the common-law niceties of pleading and procedure that formerly had been used as a means of delay and sometimes to defeat justice. California has a constitutional provision, worded differently from ours, but conveying the same general meaning, and the California court has held that:

"No presumption of prejudice arises from the mere fact of error. On the contrary, it must affirmatively appear to this court that the defendant has been substantially injured by the error complained of." *People* v. *Lawlor,* 21 Cal. App. 63, 131 Pac. 63; *People* v. *O'Bryan,* 165 Cal. 55, 130 Pac. 1042; *People* v. *Fleming,* 166 Cal. 357, Ann. Cas. 1915B, 881, 136 Pac. 291; *People* v. *Lapara,* 181 Cal. 66, 183 Pac. 545; *People* v. *Bonfanti,* 40 Cal. App. 614, 181 Pac. 80.

In *People* v. *Powers,* 23 Cal. App. 447, 138 Pac. 373, there was admitted in evidence against the defendant a letter from the chief of police of Los Angeles to a constable of the township where the crime was committed, showing defendant's bad character, and that he had several *aliases,* and had been convicted of one crime and charged with another, and containing the Bertillion description of defendant. The appellate court said of this evidence:

"The error of the admission of this sort of incompetent evidence against a defendant in this or any case must be held to be a highly prejudicial violation of an essential and long-established rule of criminal evidence intended to safeguard the character and rights of a defendant on trial for a particular crime. It is to be noted, however, that the incompetent evidence thus admitted had no direct bearing or effect upon the affirmative evidence of the prosecution with respect to the details of the crime."

The court held that it was such an error as would have required a reversal of the judgment of conviction but for the provision in the California Constitution forbidding the setting aside of a judgment or granting a new trial ''unless after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.'' The court further said:

''From the foregoing examination of the entire cause, including the evidence, this court is entirely satisfied that there has been no miscarriage of justice in this case. It is true that the error complained of was gross; and in a case wherein the evidence of guilt was less positive, direct and certain, or was contradicted by that of the defendant himself, would doubtless work a reversal of the judgment. The provision of the Constitution, while it constrains this court to affirm the judgment and order denying a new trial in this case, is not to be taken as justifying or in anywise encouraging the commission by trial courts and prosecuting officers of errors of this character in their effort, however laudable, to convict persons whom they believe to be justly accused of crime.''

In the beginning of this opinion we set forth the evidence. An analysis of that evidence produces but one conclusion, and that is that the defendant shot and killed Lem Smith. Indeed, he does not deny being present and discharging the gun that resulted in Smith's death. At most he would have had the jury believe that it was an accident, or that he was aided and abetted by the two Hawkins boys and Corbell. The many variant stories told by the defendant, as, that he left Smith in Kingman at work, that the machine had turned over on Smith, and he was unable to extricate him; the manner in which he had gone from Kingman to Los Angeles; and the very unreasonable explanation of his possession of Smith's watch, camera and purse—were evidently not believed by the

jury. No more positive, clear, plain, and convincing association of facts and circumstances ever eventuated to point out unerringly and absolutely the source of a crime than those developed in this case. Regardless of defendant's previous crime record, it is evident that the jury could have come to but one conclusion, and that was that the defendant was guilty of taking Lem Smith's life.

The record discloses but one possible defense for the defendant, and that was insanity. On that issue, it was brought out by the defendant, on the cross-examination of Dr. Donald R. Smith, who had known defendant in California, that he was committed to the insane asylum at Ukiah, California, where he remained from November 11, 1913, to February 26, 1914, on which last date he was discharged as sane. There was no other evidence on the issue of sanity by experts or nonexperts for or against defendant. The jury concluded that the defendant was sane. Their verdict on that question is conclusive.

The reasons prompting murder are often very slight and very trivial. Just why defendant should stealthily and without warning send a bullet crashing through Lem Smith's brain, after a friendly and intimate companionship for hundreds of miles across the country, eating at the same mess, around the same campfire, sleeping near each other on the ground in the open at night, and riding side by side during the days, may not be easily accounted for on rational grounds, but to conclude that he did it for what little money and effects Lem Smith had, and for his automobile as a convenient means of escape, accords with what is happening in this land of ours with almost daily frequency. The number of such cases occurring in Arizona is alarming. The circumstances of their commission exhibit extreme depravity and great ingratitude. The recipient from the automobilist of a lift across the country repays his benefactor by killing

24 Ariz.—17

him, and the manner in which he executes his diabolical deed—in the night-time, at a lonely spot, in the far-away desert—shows the taking human life does not bother him; his only concern being a safe escape.

One taking a life in such circumstances, when hailed into a court of justice, before a jury of his peers, can have in the very nature of things but one available defense, and that is insanity. It is a good defense, one recognized by the law, and, if established, entitles the defendant to an acquittal. This fact was prominently emphasized in the trial. Defendant was accorded every opportunity to show his inability to discern the difference between the right and the wrong of his act in taking life. The jury were fully advised as to what constitutes insanity and their duty to acquit defendant, if they entertained a doubt as to his sanity. Had there been serious doubt as to whether defendant took Smith's life, the collateral evidence wrongly admitted, might have been prejudicial, but under the defense of insanity its admission was probably beneficial.

Assignments 5 and 6, to the effect that the verdict and judgment are contrary to the law and the evidence, are fully covered by what we have said heretofore.

Because of the exceptionally clear case made out against the defendant, we feel that we can well say the errors committed in the trial court fail to show the rights of the defendant were prejudiced, and upon the whole case, it appears that substantial justice has been done.

The judgment of the lower court is therefore affirmed.

McALISTER and FLANIGAN, JJ., concur.