[Criminal No. 821. Filed June 29, 1936.]

[59 Pac. (2d) 312.]

DOROTHEA IRENE TURLEY, Appellant, v. STATE OF ARIZONA, Respondent.

Mr. Greg Garcia, for Appellant.

Mr. John L. Sullivan, Attorney General, and Mr. Elmer C. Coker, Assistant Attorney General, for Respondent.

LOCKWOOD, C. J.—Dorothea Irene Turley, hereinafter called defendant, was informed against by the county attorney of Apache county, for the crime of assault with intent to commit murder. She was tried before a jury which returned a verdict of guilty on the 10th day of June, 1934, and judgment was duly pronounced upon said verdict, sentencing her to a term of not less than ten nor more than twenty-five years in the state prison. After the motion for new trial was made and overruled, this appeal was taken.

In order that we may consider the appeal the better, we state the material facts of the case as they were developed by the state's evidence upon the trial, for since the jury returned a verdict of guilty, we must assume it construed any conflicting evidence in favor of the state's theory of the case.

Defendant and one Ernest J. Turley, her husband, a retired gunner's mate of the United States Navy, came to the Cross Bar Ranch in Apache county during the month of July, 1933, in hope that residence there might improve the health of the former. There were two children in the Turley family: Mattie, a daughter, about the age of fifteen, and

David, a son, about fourteen. Shortly after arriving, the Turleys became acquainted with the Pearce family, living near by. Defendant and Kent Pearce, the oldest son of the Pearce family, were particularly friendly, so much so that they made many auto trips around the country together, in the vicinity of the Cross Bar Ranch, for pleasure purposes. Their usual companions on such trips consisted of Mattie Turley and one Pollard Wiltbank, although other young men in the vicinity were occasionally with them. Defendant and young Pearce became rather affectionate on some of these rides, and the former had several times informed Mrs. Walk, a close neighbor, that she intended to marry Pearce. There had been considerable friction between defendant and her husband, so much so that on at least two occasions she remarked, in his presence, that she ought to kill him. She had repeatedly complained to her daughter Mattie of her husband's conduct, and finally the two made plans for carrying her threats into execution. On the 18th day of November, Ernest Turley and Mattie had gone to milk some cows, and while returning to the house, Mattie, who was walking behind her father, shot him twice in the hip, with a double-barrel shotgun. He was taken to a hospital in Apache county, and later removed to one in San Diego, where he died about a month after the shooting.

In the meantime, an investigation of the circumstances of the shooting was commenced by the authorities of Apache county, and a complaint, charging defendant with assault with intent to commit murder, was filed against her, signed by Marion Haws, as sheriff of Apache county. A preliminary hearing on this complaint was held on the 12th day of December, at which hearing Ernest Turley, the wounded man,

testified in behalf of the state. Defendant was held to answer to the superior court, and on the 8th day of January, the information upon which she was tried was filed. The case was later tried, and a verdict of guilty as charged was returned, whereupon she was duly sentenced.

This presents an outline of the facts shown by the state's evidence, but we shall refer to various details of the evidence as it may be advisable during the course of the trial.

■ There are some thirty-two assignments of error which we shall consider in .accordance with the questions of law raised thereby. The first two raise the issue as to whether defendant had been legally committed by the magistrate before the information upon which she was tried was filed. That such a commitment must be made under the law of Arizona is, of course, undisputed. *Quen Guey* v. *State,* 20 Ariz. 363, 181 Pac. 175; art. 2, § 30, Const. of Arizona.

■ The objection which defendant raised to the complaint and commitment, which were admittedly regular upon their face, is that the complaint upon which the warrant of arrest was issued, and upon which the preliminary hearing and the commitment were based, was signed by a person who acted merely on information and belief and who had no actual knowledge of the facts which would sustain the complaint. It is urged that under the Fourth and Fifth Amendments to the Constitution of the United States, before a warrant of arrest is issued, a complaint must be made, and such complaint must be signed and verified by someone who has personal knowledge of the facts set forth therein, and not by one who merely acts on information and belief, and that the failure to observe this rule not only violates

these amendments, but denies a defendant the equal protection of the laws granted by section 1 of the Fourteenth Amendment to the Constitution of the United States, and also violates section 4 of article 2 of the Bill of Rights contained in the Constitution of Arizona. The complaint which was signed by the sheriff of Apache county and duly verified, reads as follows:

"Before me, Frank M. Whiting, Justice of the Peace of St. Johns No. 2 Precinct, in and for the County of Apache, State of Arizona, on this 29th day of November, A. D. 1933, personally appeared Marion O. Haws, sheriff of Apache County, Arizona, who on oath deposes and says: That at and in the County of Apache, State of Arizona, and on or about the 18th day of November, A. D. 1933, one Dorothea Irene Turley, the defendant named herein, did then and there commit an assault with intent to kill, a felony, committed as follows, to-wit:

"That the said Dorothea Irene Turley, on or about the 18th day of November, A. D. 1933, and before the filing of this complaint, at and in the County of Apache, and State of Arizona, did then and there wilfully, knowingly, unlawfully, feloniously and with malice aforethought commit an assault with a certain deadly weapon, towit: with a loaded double barreled shotgun, in and upon the person of another, to-wit: In and upon the person of one Ernest Turley, a human being, with the intent then and there to kill and murder the said Ernest Turley.

"All of which is contrary to the form, force and effect of the statutes in such cases made and provided, and against the peace and dignity of the State of Arizona.

"Wherefore, affiant prays that a warrant be issued for the arrest of the said defendant, and that she be dealt with as the law directs.

"[Signed] MARION O. HAWS."

It will be observed that this complaint is definite and specific in its allegations of the essential ele-

ments of the crime of assault with intent to commit murder, and nowhere upon its face does there appear even a suggestion that its signer did not know personally the facts which he swore to be true. Defendant, however, on a motion to quash the information on the ground that no legal commitment had been made, offered to prove by parol evidence that Haws was the sheriff of the county and had no knowledge in regard to the crime charged except through information and belief. The court denied permission to offer evidence on this point. A precisely similar question was raised in *City of Holton* v. *Bimrod,* 60 Kan. 860, 58 Pac. 558, and the Supreme Court of Kansas said:

"The original complaints upon which warrants were issued by the police judge for appellants' arrest were sworn to positively, and not on information and belief. The appellants sought to introduce testimony showing that the prosecuting witnesses had no personal knowledge of the facts stated in the complaints, for the purpose of proving want of probable cause. Such testimony was not entitled to consideration. The verifications being positive in form, the requirements of the bill of rights were wholly satisfied.

"The secret reasons of the prosecuting witnesses for making the complaints could not be inquired into for the purpose of invalidating the warrants. Sufficient probable cause was made to appear to the magistrate for the issuing of the warrants by the charges made and the positive form of the verifications."

We have found no cases holding to the contrary. Defendant has cited to us several federal cases which she contends supports her contention. *Johnston* v. *United States,* (C. C. A.) 87 Fed. 187; *Ex parte McCabe,* (D. C.) 46 Fed. 363, 12 L. R. A. 589; *United States* v. *McCunn,* (D. C.) 40 Fed. (2d) 295. It is true that these three cases support the rule that a complaint

cannot be made on information and belief, but in each one it appeared from the face of the complaint that the person who signed it was acting without personal knowledge of the facts, a situation very different from that involved in the present case. We hold, therefore, following the rule laid down by the Supreme Court of Kansas, that the direct and positive allegations of the complaint herein could not be shown by parol evidence to have been in reality made on information and belief.

But even assuming that it might be so questioned, is the rule laid down by the federal courts binding upon this court? The Fourth and Fifth Amendments to the Constitution of the United States have been repeatedly and universally held to limit action by the federal government, and not to impose restrictions upon the various states. State statutes, changing the right of jury trial, and permitting prosecution by information rather than indictment, and others of similar import, have been held by the highest federal court not to be in violation of the federal Constitution, and we are satisfied that the same rule is clearly applicable to the form of complaints necessary to initiate a criminal case. For this reason, while the opinions of the federal courts are persuasive on the question here involved, they are by no means binding upon us, since no federal question is raised thereby. It is true that we have held in the case of *Malmin* v. *State,* 30 Ariz. 258, 246 Pac. 548, that section 8 of article 2 of the Constitution of Arizona is of the same general effect and purpose as the Fourth Amendment to the Constitution of the United States. We have the right, however, to give such construction to our own constitutional provisions as we think logical and proper, notwithstanding their analogy to the federal Constitution and the

federal decisions based on that Constitution. We are of the opinion that the rule requiring a complaint to be verified in all cases by a person who has actual knowledge of the facts set forth in the complaint is too harsh and, indeed, unreasonable at times. There are many cases where no one witness has personal knowledge of facts sufficient to support a conviction for a crime which has undoubtedly been committed. The evidence which proves conclusively the commission of a certain crime by a particular defendant may frequently be entirely circumstantial in its nature, and composed of the testimony of many different witnesses. If the federal rule is to be followed, it would be impossible to file a valid complaint in such a case. Apparently the purpose of the Fourth Amendment is to prevent a man from being harassed by frivolous or malicious charges. Section 4929, Revised Code of 1928, provides all the protection which a defendant needs against charges of that nature. It reads as follows:

"Examination of Complainant and Witnesses; When Warrant to Issue. When such complaint is laid before a magistrate, he may also examine under oath, the complainant or prosecutor and may subpoena and examine witnesses as to the truth of such complaint; and if the county attorney so directs, he must subpoena and examine such witnesses. If the magistrate be satisfied from the complaint and from the examination, if an examination be had, that the offense complained of has been committed, and that there is reasonable ground to believe that the defendant has committed it, he shall issue a warrant for the arrest of the defendant."

It will be seen thereby that when the complaint is laid before the magistrate, if he has any reason to believe that the person who signed it, notwithstanding his positive allegations, is acting merely

on unwarranted suspicions, he has the right, before issuing the warrant, to examine not only the complainant but as many witnesses as he may see fit, and until he is satisfied, not only from the complaint but from the testimony under oath of all of the witnesses whom he desires to call, that there is reasonable ground to believe that the accused has committed the crime charged, he is not required to issue the warrant. We are of the opinion that the practice which has, to our knowledge been followed so long in our courts of permitting either the county attorney, the sheriff, or any other proper officer of the county to file a criminal complaint in order to initiate a prosecution for a crime which they have good reason to believe has been committed, is logical, reasonable, and consistent with the Constitution of Arizona. We therefore hold that these objections are without merit.

 The next question is whether the court refused to permit defendant's counsel sufficient latitude in making his opening statement to the jury. The statutes of Arizona regulating procedure in criminal cases do not expressly give to counsel for either the state or the defense the right to outline in full the theory of the prosecution or the defense before the evidence is introduced. Section 5042, Revised Code of 1928, reads, in part, as follows:

"Swearing Jury; Order of Trial; Departure from. When the jury has been constituted, it shall be sworn to try the action, and the trial must thereupon proceed in the following order, unless otherwise directed by the court: . . . 2. the counsel for the state, must open the action, and offer the evidence in support of the charge; 3. the defendant or his counsel may then open the defense, and offer his evidence in support thereof."

This does, of course, imply that an opening statement should be made by the respective parties, and it has been the universal custom in Arizona for many years to give to them the opportunity of making one. This is the practice usually followed in most states, but it is generally held that such a statement is not, and should not be, permitted to become an argument upon the case, but it is merely intended to advise the jury sufficiently so as to prepare their minds for the evidence which is to be heard, and the extent to which counsel will be permitted to go in making such a statement is subject to the control of the court in the exercise of a sound discretion. 16 C. J. 887, and note. The statement actually made by the counsel for the defendant to the jury, and the further statement which the court refused him permission to make, are both set forth in the record. We are of the opinion that the court exercised the greatest liberality in allowing a statement of the defendant's theory of the case, only limiting her counsel when it became obvious that the statement had become, in effect a comment on and criticism of the evidence which the state was presumably to offer, and the conduct of the prosecuting officers of the state. We see no error in the action of the court on this point.

The next objection is that the court improperly admitted in evidence State's Exhibits D and E, being certified copies of two insurance policies issued by the United States upon the life of Ernest J. Turley. There were two objections made to their admission, one being that the policies themselves were not properly identified, and the other that they were not admissible for the reason that at the time they were offered, there was no proof showing that Ernest J. Turley had been intentionally shot; the *corpus delicti,* therefore, not being as yet established.

So far as the first objection is concerned, these insurance policies were first offered in evidence during the preliminary examination, and the justice of the peace entered an order providing that they might be withdrawn and certified copies thereof substituted. Thereafter, counsel for the state and for the defense stipulated that the originals were withdrawn at the request of counsel for the defense and that the certified copies might be introduced with the same force and effect that the originals were. This, of course, disposes of the objection that the policies themselves were not offered. So far as the second objection is concerned, while it would have been more regular to wait until after the *corpus delicti* was proved before offering the policies, yet the order of proof is, to a great extent, discretionary with the trial court, and since, subsequent to the admission of the policies, the *corpus delicti* was proved, we think there was no error in admitting the policies out of the regular order. Of course they were material and admissible for the purpose of showing a motive on the part of defendant for taking her husband's life. No error was committed in this respect.

 The next objection is in regard to the admission of the testimony of Ernest J. Turley, taken at the preliminary examination. The record fails to show that defendant ever objected to the admission of this transcript, or moved that it be stricken after it was admitted, and, she may not, for the first time, raise an objection of this kind in the appellate court. *Talley* v. *State*, 18 Ariz. 309, 159 Pac. 59.

 The next question is whether it was error to allow the witness Guy Lund to testify·on redirect examination that he had been told by W. A. Maxwell, deputy sheriff, that the injury sustained by Turley was not the result of an accident. Lund was

a witness for the state. Upon cross-examination, counsel for the defendant asked him, ''Now, did you learn that night or hear that night that it might not have been an accident?'' To which the witness answered, ''I did.'' On redirect examination he was asked by the county attorney from whom he had heard it, to which objection was promptly made. We think there was no error in permitting him to answer the question. Counsel for the defense, on cross-examination, had opened the matter by a question which clearly brought a hearsay statement into the record. Having opened the door, he could not object because the state further pursued the inquiry along that line.

The next objection is that the court refused to strike the testimony of one Peterson, a witness for the state. This testimony involved conduct of defendant and Kent Pearce, from which it might reasonably be implied that she took an interest in Pearce beyond that which is ordinarily proper for a married woman to take in a man not her husband. It is urged that this was collateral to the issue to be tried by the jury. The state's theory of the case was that one of the reasons defendant wished to cause her husband to be killed was because she was infatuated with Kent Pearce and desired to marry him. We think evidence of the relations existing between defendant and Pearce was not collateral, but material and admissible upon the question of motive.

The next assignment of error is that the court erred in allowing Mrs. Lillie Walk, a witness for the state, to testify as follows, referring to Pearce:

''He brought me some pork chops and said Mrs. Turley had sent me some pork chops and said to tell me to keep my mouth shut.''

So far as we have been able to determine, the only recorded case in which a message regarding pork chops has appeared, is the very famous one of *Bardell* v. *Pickwick*. In that case, indeed, the defendant was found to have entered into an engagement of marriage with the plaintiff, to a great extent upon the evidence of the pork chops. We would point out, however, that some tomato sauce was also involved in the message in the case just cited, and further that no objection was there made to the evidence, so that the question of its admissibility could not have been reviewed in an appellate court, even had an appeal been taken. This case, therefore, offers us but little aid in the solution of the question involved herein. It is urged that this was purely hearsay so far as alleged statements made by Mrs. Turley were concerned, she admittedly not being present at the time the alleged statement was made by Pearce to Mrs. Walk. Clearly the statement by the witness Walk that a third party had told her that Mrs. Turley said something to him was hearsay of the rankest type. It is urged by the state that since Mattie Turley, on the stand, testified that defendant had instructed Pearce to carry this message, it showed that the latter was the agent of Mrs. Turley, and that, therefore, she was bound by his statement. This is a new application of the doctrine of agency in a criminal matter, and we are not impressed with the correctness of the reasoning. It was quite proper for Mattie Turley herself to testify as to the remark which she heard the defendant make. It would have been equally proper had Pearce himself testified that defendant delivered to him this message for Mrs. Walk, but to endeavor to bind the defendant by Mrs. Walk's testimony that Pearce told her that defendant had made the statement is certainly error.

■ The next question is whether the testimony of Mattie Turley was sufficiently corroborated so that there was evidence to take the case to the jury. Section 5055, Revised Code of 1928, reads as follows:

"Corroboration of Accomplice. A conviction can not be had on the testimony of an accomplice, unless he is corroborated by other evidence which, in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense, or the circumstances thereof."

The only direct evidence connecting the defendant with the shooting of her husband was the statement of Mattie Turley, the daughter. This statement, in substance, was to the effect that she and her mother had been in the habit of using an ouija board—a device which is generally considered an amusing toy and whose action is considered by physiologists and psychologists to depend upon the conscious or subconscious mind of the operator and the voluntary and involuntary movement of the muscles, but which by some credulous persons is believed to convey communications from the spirit world. Mattie Turley testified that the board so operated by herself and her mother told her that it was her duty to shoot her father, and that her mother, therefore, urged her to follow the advice of the board, and that she finally did so, and fired the shots which ultimately caused the death of Ernest Turley, for the purpose of killing him. If the evidence of Mattie Turley is true, there can be no doubt that defendant was guilty of the offense charged and, indeed, as the ultimate result has showed, of being a principal in a most brutal and unprovoked murder. But, by her own statement, Mattie Turley was an accomplice in the crime. It was, therefore, necessary for the state,

under section 5055, *supra,* to introduce evidence "which, in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense." Let us examine the record to see whether there is enough evidence to satisfy the statute. It appears from the testimony of Ernest J. Turley that for a long period of time there had been bad blood between himself and his wife, and that on at least two occasions, she had stated that she ought to kill him, or words to that effect. It further appears that his life was heavily insured in her favor, and that she was, perhaps, infatuated with another man and had declared that she intended to marry him. Such marriage could only be consummated through divorce or by the death of Turley. That a crime, with intent to murder, had been committed was clearly proven by the testimony of Mattie Turley herself, and this, of course involved the question of whether she alone was guilty of the offense, or whether she had an accomplice. Disregarding all of Mattie Turley's statements in regard to the connection of defendant with the shooting, when we take into consideration the fact that the actual perpetrator of the crime was a fifteen year old girl, that there had been trouble between her father and her mother for some time, that the latter had expressed the wish, in substance, that her father was dead, and was carrying on a liaison with another man, and that Turley's life was insured in favor of his wife, we think it would have been strange, indeed for any reasonable man to believe that a girl of that age, would deliberately attempt to kill her father without some outside influence being brought to bear upon her, and that the mother was probably that influence. In the case of *Reynolds* v. *State,* 14 Ariz. 302, 127 Pac. 731, the court said:

"The corroborating evidence must, of itself, and without the aid of the testimony of the accomplice, tend, in some degree, to connect the defendant with the commission of the offense. *It need not of course, be sufficient to establish his guilt; for, in that event, the testimony of the accomplice would not be needed. But it must tend, in some slight degree at least, to implicate the defendant.* The purpose of the statutes was to prohibit a conviction, unless there was some evidence, entirely exclusive of that of the accomplice, which, of itself, and without the aid of the accomplice, tended to raise at least a suspicion of the guilt of the accused." (Italics ours.)

And we followed the same rule in the cases of *Leverton* v. *State,* 23 Ariz. 482, 205 Pac. 321, and *Houston* v. *State,* 39 Ariz. 117, 4 Pac. (2d) 388. We think there was sufficient corroborating evidence to take the case to the jury.

█ We next consider the question as to whether the court erred in refusing to allow counsel for defendant to cross-examine the witness Mattie Turley in regard to her signing a certain criminal complaint, and her reason for so doing. It appears from the record that Mattie Turley, at some time after the preliminary examination, signed a criminal complaint charging Kent Pearce with statutory rape upon her. The matter apparently never went any further than the complaint, and the charge was eventually dismissed. Her testimony, in chief, did not in any way refer to this complaint, but during the cross-examination counsel for defendant tried to question her in regard to the matter, and to ask whether the true reason for signing the complaint was not to intimidate Kent Pearce into testifying falsely against defendant during the progress of the case. The matter came up repeatedly during the course of the trial, both through offers of proof and questions asked of Mattie Turley and other wit-

nesses. The court finally ruled that such cross-examination was not permissible. Without referring to the particular manner or instances in which the issue was raised, we discuss it from the standpoint of the legal principle involved. It is evident from what we have already said that the entire case for the state was necessarily dependent upon a belief by the jury that Mattie Turley was a truthful witness. If they thought that her testimony was not to be believed, they must necessarily have acquitted the defendant, for without that testimony there was nothing but a strong ground for suspicion remaining against her. So far as direct evidence was concerned, there were only the assertions by her and the denials thereof by defendant. It was, therefore, both vitally necessary and proper for the latter to attack Mattie Turley's credibility and veracity. One of the permissible methods of doing this was by the cross-examination of the witness when upon the stand, and in such a type of cross-examination it is usually considered permissible to ask any question which logically and reasonably would tend to show any bias, interest, or prejudice on the part of the witness. The thing which counsel for defendant was attempting to show was that she had made a false charge against one of the material witnesses for the purpose of intimidating him into swearing falsely through fear of a prosecution for a major felony. If Mattie Turley had gone to a witness personally and asked him to testify falsely, it would certainly seem that she might be cross-examined as to that point for the purpose of showing bias and interest, for it is hard to see how they could be more clearly shown than by proving that the witness had attempted to suborn perjury in order to secure a conviction. We think that it makes no difference

whether the attempt at subornation of perjury was made by a mere request, a threat of a criminal prosecution, or the actual initiation of one, except that it might reasonably be inferred that the more desperate the attempt to secure false testimony, the more likely it would be that the party making that attempt would herself resort to perjury to attain her end. It seems to us that this general line of questioning was both material and proper for the purpose of showing bias or prejudice on the part of the witness Mattie Turley, and that it was, therefore, error for the court to sustain the objections made by the state thereto. .

█ It is true that the court did offer to permit defendant to show that others than Mattie Turley had attempted to intimidate the witness Kent Pearce, and did permit the latter to testify to such attempts, and that he was not intimidated, but told the truth notwithstanding these threats. This, however, while material and proper does not cure the error of refusing to permit the question to be asked directly of the witness whose bias the defendant was attempting to show, whether she had not signed the complaint for the purpose of influencing the testimony of Pearce.

█ The next question is whether the court erred in refusing to permit counsel for the defendant to show in detail certain things which he desired to prove along this line, in an offer of proof. It appears that counsel for defendant was permitted once to set forth in detail what he wished to show by the witness Mattie Turley on cross-examination, and that the subsequent offers were, in substance, an attempt on his part to repeat the original offer in a different form. After the first offer had been made and it appeared to the court that the subsequent ones were to

be substantially the same, we think there was no error in refusing to allow counsel for defendant to repeat the same offer over and over again. The point was sufficiently reserved for this court by the first offer and rejection, and it was not necessary for the court to waste time by repeating its ruling after a repetition of the offer.

■■■ The next question is whether the court erred in first striking the evidence of the witness Crosby and later instructing the jury to consider it. We have examined the transcript of record in this respect, and are satisfied the action of the court was correct, both in striking and afterwards in reinstating the evidence, nor do we think, as suggested by counsel for defendant, that in advising the jury it might consider it, the court commented on the evidence in a manner not permitted by law.

■■■ The next objection raised is that the defendant did not receive a fair and impartial trial, for some sixteen reasons. These sixteen reasons are, in substance, that defendant was not permitted to introduce evidence tending to show that the county attorney, the sheriff, the assistant attorneys general who aided in the trial of the case, and the trial judge, were all engaged in a conspiracy to convict defendant by any means, legal or illegal within their power, and that in furtherance of this conspiracy there was a consistent and persistent attempt on their parts both to intimidate and persuade the witness Mattie Turley into giving false testimony, and an unwarranted and illegal attack upon the personal character of the defendant by bringing to the attention of the jury matters which were almost certain to prejudice it against her in the highest degree, although these matters, even if true, were not legally admissible and had no bearing upon the issues involved in the ·

present case. These charges, if true, would justify the severest criticism of the officials engaged therein by all right-minded persons, and if believed by the jury, would doubtless have caused an instant acquittal of the defendant. And a refusal by the court to permit any legal evidence in support of those charges to be submitted to the jury would have been prejudicial error of the gravest kind. Counsel for the defendant, in referring to the matter, in his brief in this court and in his argument in support thereof, has not cited to us the places in the reporter's transcript which sustain his contention that these errors were, in fact, committed. The Attorney General, however, in his reply brief, states as follows:

"The facts which appellant sets forth under this assignment of error are most likely in the record and we cannot dispute the fact that they are, . . . "

It is the duty of counsel to prepare a case for submission to this court in such a manner that we will not be compelled to look for the proverbial "needle in the haystack" to determine whether the error actually occurred. The reporter's transcript in this case consists of something over 1400 typewritten pages, and it is imposing a tremendous and unfair burden upon us to ask us to take the many general allegations made in assignment No. 15 and carefully review these 1400 pages, sentence by sentence, so that we may determine whether the things which the defendant said were done actually occurred or not, and we might well refuse to consider the assignment for a failure to comply with section 2 (a) of rule 7 of this court, referring to the matters which should be included in the brief of the appellant, which include:

"A concise statement of the ultimate facts of the case as appellant contends them to be proven by the evidence submitted upon the trial, and material to

the determination of the issues presented in this court. Such statement should not contain evidentiary matter unless the same is material to a proper consideration of the questions presented, and *in such case proper reference to the page of the abstract and the transcript of the evidence, if any, showing such evidence must be made.* No reference need be made to folios." (Italics ours.)

When, however, the Attorney General admits, as he has done, that the facts set forth in the assignment of error appear in the record, we think that in the interest of justice we should assume that they do so appear. In addition to refusing to admit evidence of the conspiracy above set forth, it is alleged the court permitted the state to attempt to show: (a) That defendant had an illicit love affair several years before the trial of the present case with another person in no way concerned herein; (b) that she did not pay her bills; (c) that she had said (in a community to a large extent composed of members of the Mormon church and one where many such members were practically certain to have been on the jury which tried her) that "the Mormons are God dam sons of bitches"; (d) that she carried liquor in her car; (e) that she was generally a woman of loose morals. Certainly, evidence of this kind could have no legal bearing upon the charge upon which defendant was convicted, and it must be obvious at a glance that it was calculated, in the highest degree, to prejudice her case before a jury.

Since it appears many errors were, in fact, committed in the course of the trial, the only question remaining before us is whether the case must be reversed on account of these errors, or whether it presents the situation contemplated by article 6, section 22, of the Constitution, which reads as follows:

"The pleadings and proceedings in criminal causes in the courts shall be as provided by law. No cause shall be reversed for technical error in pleading or proceedings when upon the whole case it shall appear that substantial justice has been done."

We have held previously that the ultimate test for this court to use in determining whether this section of the Constitution applies, is "if the errors appearing in the record had not been committed, is there a reasonable probability that the verdict of the jury might have been different?" And in answering this question, the members of this court must necessarily act as the triers of fact and, putting themselves as nearly as possible in the position of the jury, determine whether, as reasonable men, the errors committed probably affected the verdict.

██ The case, as presented to us, is one of the most remarkable which has ever come before us. Taking the record as a whole, there is but one material fact which is established beyond peradventure, and that is, that Ernest Turley, on the 18th day of November, 1933, was shot by his daughter Mattie Turley. The evidence is such that a reasonable man must have reached one of the following conclusions therefrom as to the true circumstances surrounding the shooting: (1) That the shooting was, in fact, accidental, but that Mattie Turley, for some purpose of her own and of her own volition, or else impelled thereto by threats and promises held out to her by the prosecuting officers of the state, falsely claimed that it was intentional on her part; (2) that the shooting was deliberate and intentional on the part of Mattie Turley, but that in order to protect herself from the penalty provided by law for such conduct, she, either of her own volition or induced by the threats and promises of the officers, falsely accused her mother of instigating it; (3) that her story was

true and that her mother had deliberately planned to have Ernest Turley killed, and induced Mattie to be the active agent in such killing. We think it beyond doubt that in determining which of the three situations set forth actually existed, any reasonable jury would be greatly influenced by their belief as to whether Mattie Turley was deeply interested in seeing that defendant was convicted, and had been improperly influenced by the officers of the state, or was an impartial witness testifying truthfully to the facts as they existed, and in their opinion of the general moral character of defendant. Any one of the three theories above set forth shows an extreme degree of moral turpitude and depravity on the part either of Mattie Turley or of her mother. For this reason, error in the admission or rejection of evidence which went to their character, both generally and for bias and truth, was bound to be highly prejudicial. And since, as we have said, the court erred in refusing to admit evidence which would necessarily, if true, have tended to destroy a belief in Mattie Turley's testimony, and in admitting of evidence which necessarily deeply affected the opinion of the jury as to the general character of defendant, we are of the opinion that we cannot say affirmatively, under article 6, section 22, of the Constitution, that substantial justice has been done to defendant in the present case.

There are many other questions raised by the appeal, but we think it unnecessary to discuss them.

The judgment of the superior court of Apache county is reversed, and the case remanded for a new trial.

McALISTER and ROSS, JJ., concur.