[Crim. No. 4438. Second Dist., Div. One. July 31, 1950.]

THE PEOPLE, Respondent, v. CAROL DeWITT, Appellant.

William P. Butcher for Appellant.

Fred N. Howser, Attorney General, and Donald D. Stoker, Deputy Attorney General, for Respondent.

WHITE, P. J.—In an information filed by the District Attorney of Ventura County, defendant Carol DeWitt and John Lucius Gifford were jointly charged in count I with the crime of attempted robbery of Ernest Westley Garrison, and in count II with the offense of assault with a deadly weapon upon the said Garrison.

Following the entry of not guilty pleas by both defendants the cause proceeded to trial before a jury resulting in verdicts finding defendant DeWitt guilty as charged in both counts of the information, and the defendant Gifford not guilty as to both counts.

Following denial of defendant DeWitt's motion for a new trial and the pronouncement of judgment he prosecutes this appeal from the judgment of conviction and from the order denying his motion for a new trial.

Epitomizing the evidence which gave rise to this prosecution, the record reflects that on August 10, 1949, the aforesaid Mr. Garrison was operating a service station on the corner of Main Street and Katherine Drive in the city of Ventura. At 7:20 o'clock on the evening of that day Mr. Garrison, who was alone in the station, waited upon a customer in a tan Chevrolet sedan automobile, which vehicle was identified as belonging to defendant DeWitt. Mr. Garrison could not identify the people in the tan Chevrolet automobile because he was very busy and in a hurry to go home. Thereafter, another car drove into the station, the driver checked the tires and water and drove away. Thereupon, Mr. Garrison immediately went inside, put away his lube guns, Coca-Cola machine, and other equipment. He took that day's receipts from the money till, put it into his moneybag, turned the lights off on the outside of the station, and walked out of the front door, locking it. He walked around the corner of the service station and started to enter his truck. He had his right hand on the handle of the door of the truck, his left hand on the window frame, and was about to open the truck door when a man, later identified at the trial by Mr. Garrison as defendant DeWitt, gave the former a command,

"Just a minute there, Buddy." Until then Mr. Garrison did not know that anyone was in the area. He turned to his right and first observed a tall, rather slender man standing at the back end of the truck near the rear fender. Mr. Garrison could not positively identify defendant Gifford as that man, although he stated that the size and build of the man corresponded to the size and build of the defendant Gifford. Next to the large window of the station and a short distance away from him, Mr. Garrison saw a man, later identified by him as defendant DeWitt, and who had a "six-shooter" pointed at Garrison's stomach about three inches therefrom. The man with the gun was described as blond, heavy set, "chunky," and was about 180 or 190 pounds in weight. His facial features were "full, chunky, heavy built." He was "soft-spoken" and "wasn't excited." As Mr. Garrison turned around this man said, "Buddy, this is a stick-up." Mr. Garrison "looked him right in the eye for a little while" and not being "quite sure" that it was a "stick-up" said, "What did you say?" to which the man replied, "Bud, this is a stick-up." Mr. Garrison reached out, grabbed the gun with both hands and turned the weapon away from him, at the same time attempting to take possession of the weapon. His assailant beat him on the hands in an effort to make him let go but Mr. Garrison continued to hold on and "wouldn't turn loose of the gun and he (the assailant) fired once, then maybe I would say maybe twice, or two reports, it seemed like." According to the witness Garrison, he may have closed his eyes or looked away while "I was battered over the hands." The attacker then hit Mr. Garrison on the top of the head and knocked him on the ground. Thereupon the two intruders fled. Mr. Garrison then ran to the home of Mr. Vander Haar who lives across the street, shouting, screaming, and making considerable noise. As he ran through the street, Mr. Garrison could see his assailants running up Katherine Drive. He attempted to procure aid to pursue the men but was unsuccessful. About 10 or 15 minutes thereafter Mr. Garrison was taken to the county hospital where his injured hand and body were treated. A wristwatch on his left hand had been smashed "very flat."

.At the time of the alleged offenses, neon lights on a clock on the corner of the driveway were burning, as were two street lights, one in the alley at the back of the service station lot and another at the intersection of Katherine Drive and Main Street, approximately 90 to 100 feet from the service station.

The light at the back of the lot was some 95 to 100 feet from the intersection up Katherine Drive. The lights inside the station were off but the sun had set only 15 or 20 minutes and it was not "completely dark.".

The clock lights consisted of two light tubes following the circular perimeter of the clock, a green one on the outside which was a solid circle of light, and a red one on the inside, which apparently seemed from certain angles to be a solid circle of light but which was actually half painted with black. The lights on the clock, according to Mr. Garrison, served to "help show the items up inside of my station and see if somebody is in there at night."

Shortly after 7:35 on the evening in question, a witness, John Earl Taft, saw a man yelling and hollering for help at the intersection of Katherine Drive and Lexington Street and he also observed that two men were running on Katherine Drive toward Poli Street. He described one as rather short and chunky, of heavy build, and the other as about a head taller than his companion, and weighing about 180 pounds. The former wore khaki clothing and the latter wore a silver-white hat.

At about 7:30 o'clock on the night in question, Patricia Smith, 11 years old, who lived at 49 North Katherine Drive, saw a tan car drive up and park. It parked on the west side of North Katherine Drive between Main Street and the alley which was parallel to Main Street, running between the latter street and Lexington Street. The two men got out and one started toward the back of the service station, the other toward the lavatory. One of these men was taller than the other. A few minutes later she heard something "like a baby crying" she went to the door and observed Mr. Garrison running across the street to Mr. Vander Haar's house.

At the time Miss Smith heard Mr. Garrison scream she looked at her watch and it was 7:40 p. m. Her father went out of the house, returning after the ambulance had taken Mr. Garrison. A minute or two thereafter, Miss Smith told her father what she had seen. He then went out of the house, took a description of the car and the license number. This vehicle was later identified as belonging to defendant DeWitt. After taking the license number Mr. Smith gave it to a police officer and upon returning to his home found the automobile gone.

On August 11, shortly after 6 o'clock in the morning, police officers saw defendants DeWitt and Gifford enter the Cottage Café. Defendant DeWitt opened the screen door first, put his

hand on the doorknob, started to open the door, observed the officers who were sitting inside the café. He thereupon hesitated, and defendant Gifford who was behind him, "bumped into him." While the two men were sitting in the café under the observation of the officers they appeared to be "nervous, ill at ease." They were arrested shortly thereafter.

On September 17, 1949, a witness testified he saw a revolver in a load of dirt which had been hauled from the parking lot behind the junior college, which is situated about a quarter of a mile from Mr. Garrison's service station, to the property of the witness on Ramona Street. The weapon had one empty shell and five loaded shells in it when found.

The bullet discharged from the gun in the struggle at the service station was picked up by an officer from under the back seat of the Garrison truck. It was examined by a ballistics expert, who testified at the trial that it was his opinion that the bullet passed through the barrel of the foregoing gun.

As a witness in his own behalf, defendant DeWitt testified that he was not at the scene of the crimes at the time of their commission. He testified that he had come to Ventura about four days prior to August 10 in an effort to obtain a job. That on the day in question he and his codefendant went to a beach at Oxnard, near Ventura, about noon and started back to the latter city at about 5:30 p. m., stopping en route to buy some food and to fill the gas tank of the automobile "clear to the top." That they returned to their hotel where they remained some thirty minutes and then visited friends who lived in a nearby auto court. They returned again to the hotel at about 7:20 p. m. and parked DeWitt's automobile on the hotel parking lot, leaving the key in the switch. That when appellant left his automobile on the night in question the door was closed but when he returned the next morning it was open about an inch. He testified that he remained in his hotel room until about 8 o'clock when he went to a moving picture show. That defendant Gifford left the room at about 7:20 p. m. That on the night in question he had 91 cents and the room rent was not paid, but that his codefendant was paying for the hotel accommodations.

The codefendant Gifford, according to his testimony, came into the hotel at about 8:20 or 8:30 p. m. and shortly thereafter he visited other people in the hotel, remaining in their room for an hour and a half to two hours. In this testimony defendant Gifford was corroborated, but defendant DeWitt

was unable to name a single person he had seen between 7:20 and 11 o'clock on the night in question.

As grounds for reversal, appellant first challenges the sufficiency of the testimony of the victim Garrison identifying him as the assailant. In that regard it is urged that the victim was afforded only a few seconds during the struggle with his attacker within which to identify the latter. That the victim was frightened, that he was unable to identify the codefendant Gifford, and that the light at and about the spot where the encounter occurred was insufficient to permit identification of a person within so short a space of time.

It is the function of the jury to pass upon the strength or weakness of the identification and the uncertainties if any, of the witnesses in giving their testimony. It is not necessary that any witness called to identify the accused should have seen his face. In *State* v. *Mason*, 152 Minn. 306 [189 N.W. 452], the court said: "Identification may be sufficient though the person making it cannot remember the face. Identification based upon other peculiarities may be reasonably sure." In the case just cited the Minnesota Supreme Court held that identification may be sufficient though the witnesses say that they could not identify the accused from his face, the crime having been committed in the dark, but that they could identify him from his size, his general appearance, his talk and his walk. In *Bowlin* v. *Commonwealth*, 195 Ky. 600 [242 S.W. 604], the identification held to be sufficient was made from a recognition of the defendant's voice.

In the case now before us the complaining witness was able to identify appellant by his build, "he was heavy-set, chunky," by his complexion "blond," by his facial features, "his face was very full, chunky, heavy-built . . ." The witness described the appellant's manner of speech as "very soft-spoken."

Furthermore, and notwithstanding the above, the complaining witness in the case at bar made a positive identification of appellant when at the trial he testified as follows:

"Q. By MR. DEEM (Deputy District Attorney): Mr. Garrison, did you ever see after that night the man who was holding the gun? A. Yes.

"Q. When did you next see him? A. At 9:00, 9:30 the next morning down at the police station.

"Q. At the Ventura City Police Station? A. The City Police Station in Ventura, yes, sir.

"Q. Are you sure it was the same man? A. Very sure.

"Q. Is that man in Court today? A. Yes.

"Q. Can you point him out to the Court and jury? A. He is the light-headed fellow over here with the red colored shirt on.

"Mr. Deem: Let the record show that he has pointed to the Defendant DeWitt."

In addition to the testimony of the victim of the robbery and assault there was circumstantial evidence pointing toward the guilt of appellant. His car was identified by witnesses at the scene of the crimes, and one witness saw two men get out of the vehicle just prior to the commission of the offenses. The jury was not required to believe appellant's alibi defense nor to give credence to the assumption based thereon, that someone stole the appellant's automobile, abandoned it at the scene of the crime, later retrieved it and returned it to the point from which it was taken.

With reference to the foregoing, as well as appellant's contentions that the victim was unable to identify the former's codefendant, and that the lighting at the scene was insufficient to enable the complaining witness to identify appellant, they are fully answered by what this court said in the case of *People* v. *Hightower,* 40 Cal.App.2d 102, 106 [104 P.2d 378], as follows:

"While the claimed inconsistencies in the testimony of the foregoing witnesses, such as the positions they were in at the time when they claimed ability to see and identify appellant, as well as other claimed weaknesses in their testimony, undoubtedly afforded grounds for a forceful argument to the jury, nevertheless they cannot avail appellant as grounds for a reversal, because the evidence identifying a defendant as the perpetrator of the crime charged need not be positive and uncontradicted. As stated in *People* v. *Farrington,* 213 Cal. 459 [2 P.2d 814] : 'The strength or weakness of the identification, the incompatibility of and discrepancies in the testimony, if there were any, and the uncertainties of witnesses in giving their testimony, were matters solely for the observation and consideration of the jurors in the first instance, and for the consideration of the trial court on motion for a new trial. It has approved the finding of the jury, and on appeal this court may not disturb such finding and the action of the trial court unless we can say, as a matter of law, that there was no evidence to support the conviction.' Undoubtedly because reviewing judges are obviously in no position to determine the credit

which should be accorded to witnesses or to weigh their testimony, our Constitution provides that appellate courts are without authority to review evidence except where, on its face, it may justly be held to be insufficient to support the ultimate issue involved, in which latter case of course it is not a review of a question of fact, but purely one of law. The jury being the exclusive judges of the credibility of witnesses (Code Civ. Proc., § 1847) and of the effect and value of evidence addressed to them, except as modified by section 2061 of the Code of Civil Procedure, they were in this case justified, if they conscientiously felt warranted in so doing, after full and fair consideration thereof, to reject any testimony or circumstances which might have been contradictory to or inconsistent with testimony identifying appellant as hereinbefore narrated. We perceive nothing in the testimony identifying appellant that would warrant us in saying that such testimony is not true or is improbable upon its face.''

Appellant next complains that the court was guilty of prejudicial error in admitting into evidence pictures taken for experimental purposes and the testimony with respect thereto.

In this regard the record reflects that between 7:30 and 7:45 p. m. on the night of September 27, 1949, pictures were taken to indicate to the jury what could be seen at the locus of the crimes at that time of night. A camera was located near the left door of the truck on the side of the same next to the station, and the truck was placed at approximately the same position at which the complaining witness stood when he was approached by his assailant, at eye level. Mr. Garrison directed the placing of the camera himself. He posed for the pictures in the same place he testified appellant had stood on the night of the offenses, 42 inches from the place in which the victim had stood on the night of the crimes. A photographer then took four pictures at time exposures of from 15 to 90 seconds.

The rule is well established in this state that the admissibility of evidence given in the nature of an experiment lies within the sound discretion of the trial court so long as substantially the same conditions obtain in the experiment as existed in the original act. And there is no abuse of discretion where it reasonably appears that the evidence tends to aid rather than to confuse the jury (*People* v. *Dyer,* 11 Cal.2d 317, 321 [79 P.2d 1071]; *People* v. *Glab,* 15 Cal.App.2d 120, 123 [59 P.2d 195]; *People* v. *Crawford,* 41 Cal.App.2d 198, 206 [106 P.2d

219]; *People* v. *Woon Tuck Wo*, 120 Cal. 294, 296, 297 [52 P. 833]).

In the case at bar the pictures complained of by appellant were taken under substantially the same conditions as those prevailing at the time the offenses were charged to have been committed. They were taken at the same time—between 7:30 and 7:45 p. m., only the neon lights on the clock and the two nearby street lights were on—as was the case at the time of the alleged offenses. The camera and its subject were placed to correspond to the positions of the complaining witness and appellant on the night of the crimes. The atmospheric conditions with respect to fog were the same; there was none on either night. One of the pictures was taken at a time exposure at least approximating the time within which the complaining witness was engaged in defending himself against his assailant, 15 seconds.

Manifestly, the principal conditions were the same, and the jury could weigh and make allowances for any differences contended for by appellant. The court did not err in admitting this testimony.

■ Finally, appellant asserts prejudicial error because of the failure of the court to give the instruction provided for in section 1127(b) of the Penal Code with reference to expert testimony. This charge of prejudicial error is predicated upon the claim that the testimony of the expert, "was largely circumstantial," and "was uncertain and not conclusive."

The prosecution resorted to the testimony of a forensic chemist and ballistics expert to establish the fact that the gun found in a load of dirt about a quarter of a mile from the scene of the crimes was the one used by the perpetrator thereof. After amply qualifying as a forensic chemist and ballistics expert, the witness Leland V. Jones testified that it was his opinion that the bullet found under the rear seat of the victim's truck and introduced into evidence had passed through the barrel of the foregoing revolver. He gave as reasons for his opinion (1) the fact that the test bullet and the bullet found at the scene of the crimes were of the same weight, and (2) the photograph introduced into evidence, showing the similarity of striations (markings made by the gun barrel in firing) between the two bullets.

Appellant's contention that the evidence in the case, taken in its entirety, was "largely circumstantial" is without merit. The victim of the attempted robbery and assault positively

identified appellant as his assailant and we find nothing "uncertain" and "not conclusive" in the testimony of the expert witness.

That it was the duty of the court to give an instruction in accordance with the provisions of section 1127(b) of the Penal Code admits of no argument, and that is so regardless of whether the accused requested such an instruction. The statute in question makes it the imperative duty of the court to give such instruction irrespective of the action of the accused in relation thereto. We entertain no doubt that it was error to fail to give the statutory instruction as to expert witnesses. The court, however, did give an instruction as to the jurors being the sole and exclusive judges of the effect and value of evidence and the credibility of witnesses.

After examining the entire cause, including the evidence, we cannot see how a different verdict could have been rendered if the omitted instruction had been given. While the cited code section provides that the instruction should be given where applicable, section 4½ of article VI of our state Constitution is equally mandatory in its nature, and deprives us of the power to set aside a judgment unless we shall be of the opinion that the error complained of has resulted in a miscarriage of justice. In the case now engaging our attention we cannot perceive wherein the court's omission to give the required statutory instruction resulted in any miscarriage of justice. Therefore, we are without authorization to order a reversal of the judgment. (*People* v. *Williamson*, 134 Cal. App. 775, 780, 781, 782 [26 P.2d 681]; *People* v. *Brac*, 73 Cal.App.2d 629, 639, 640 [167 P.2d 535], and cases therein cited; *People* v. *Moore*, 70 Cal.App.2d 158, 165 [160 P.2d 857].)

For the foregoing reasons, the judgment and the order denying defendant's motion for a new trial are and each is affirmed.

Doran, J., and Drapeau, J., concurred.