278 P.2d 432

**STATE of Arizona, Appellee,**

v.

**Andrew POLAN, Appellant.**

No. 1058.

Supreme Court of Arizona.

Dec. 28, 1954.

Alan Philip Bayham and Raymond Ruff-steter, Phoenix, for appellant.

Ross F. Jones, Atty. Gen., and William T. Birmingham, Asst. Atty. Gen., for appellee.

STANFORD, Justice.

This is an appeal from a judgment of conviction and the denial of motions to quash information, to dismiss prosecution, and for new trial which were made in connection with the trial of defendant-appellant for first degree murder.

The facts, viewed in the light most favorable to sustaining the verdict and judgment below, are as follows: On the evening of October 30, 1953, defendant Polan and his common-law wife, Irene, engaged in a quarrel which followed an afternoon and evening of drinking. Around 10 p. m. Irene phoned some friends, Mr. and Mrs. Bak, and asked them to come and take her from the Polan apartment located on West Van Buren Street, Phoenix. The Baks called for her and took her with them as they visited several taverns. At the last one, the Seventh Street Buffet, they met the decedent, Herbert Weight. When the tavern closed at 1 a. m., the Baks went home and left Irene with Mr. Weight.

Some time around 1:30 a. m., defendant called at the Bak home located on West Madison and asked where Irene was. When Mrs. Bak informed him that Irene was coming home with a man she had met at a tavern, defendant swore and said he would kill her and the man with her. Defendant went away in search of his wife; he returned in fifteen or twenty minutes, took a gun from the glove compartment of his car, and again went up to the Bak house. While defendant talked to Mrs. Bak, a car passed them and stopped across the street a few houses further west. The horn of the car blew and defendant went over to it. He looked inside and after demanding "What the hell are you doing in there?", pulled Herbert Weight from the car. A struggle between the two ensued in which Weight was shot. Defendant started to take Weight to the hospital, but upon discovering that he was dead, abandoned both

the body and the car he was driving a few blocks from his destination. Defendant was picked up soon afterwards and, according to the arresting officers, admitted that he had shot the decedent.

The jury found defendant guilty of murder in the first degree and fixed the punishment at life imprisonment. On March 5, 1954, judgment was rendered and sentence imposed.

The first and second assignments are based on the denial of motions to quash the information. The first goes to the failure of the court reporter to file the transcript of the preliminary examination within ten days after the close of the examination, as required in Chapter 67, Section 2, Laws 1953, now appearing as Section 44–317, A.C.A.1939, 1954 Supplement. The second assignment goes to the fact that defendant did not receive the requisite preliminary examination because his wife was forced to testify against him at the preliminary hearing in violation of Sections 44–503, A.C.A. 1939 and 44–2702, A.C.A.1939.

An examination of Rule 208, Cr. Proc., Section 44–1005, A.C.A.1939, which enumerates the grounds for a motion to quash, indicates that neither of the above grounds is within the provision. This being the case we need look no further to affirm the lower court's denial of the motion to quash. State v. Dunivan, 1954, 77 Ariz. 42, 266 P.2d 1077.

The third assignment of error goes to defendant's right to a trial within sixty days from the date of filing the information as provided in Section 44–1503, A.C.A. 1939.

Defendant argues that the trial was started four days after the statutory period had lapsed, and that at no time did he waive his right. The motion for a speedy trial was filed at the time of arraignment, the same day on which the trial date was reset from January 26th to February 2nd.

The crux of the problem is what interpretation is to be placed on the latter portion of Rule 289, supra. It reads:

"* * * if he is not brought to trial for the offense within sixty (60) days after the indictment has been found or the information filed, the prosecution shall be dismissed upon the application of such person, or of the county attorney, or on the motion of the court itself, *unless good cause to the contrary is shown, by affidavit, or unless the cause has not proceeded to trial because of the defendant's consent or by his action.* When good cause is shown, the case may be continued, in which event the defendant shall be released on bail * * *." (Emphasis supplied.)

The State contends that the trial was reset because of defendant's act, that of requesting a bill of particulars a mere eight days before trial. The minute entries support the State's contention. In view of this fact, the statement that he did not

waive the sixty-day provision, which defendant made after the trial was reset, cannot be recognized as providing a valid ground for a motion to dismiss prosecution.

In his fourth assignment defendant contends that the lower court committed error in denying two timely requests that the State be required to follow an order of proof that would establish the *corpus delicti* prior to the introduction of testimony of admissions. This reversal of the usual order of proof, it is argued, made defendant appear to be against law and order and thus deprived him of a fair and impartial trial.

■ Because the *corpus delicti* was subsequently proved by the State, our case of Turley v. State, 1936, 48 Ariz. 61, 74, 59 P.2d 312, 318, is controlling in this matter.

"* * * So far as the second objection is concerned, while it would have been more regular to wait until after the *corpus delicti* was proved before offering the policies, yet the order of proof is, to a great extent, discretionary with the trial court, and since, subsequent to the admission of the policies, the *corpus delicti* was proved, we think there was no error in admitting the policies out of the regular order. * * *"

Although there was no prejudicial error in the trial court's permitting an inversion of the usual order of proof, it would have been better practice to prove the death and criminal agency before connecting the defendant to the offense. III Warren on Homicide, Section 303 (1938); 23 C.J.S., Criminal Law, § 1046.

The fifth assignment of error goes to the admission into evidence of gunshot patterns on white blotting paper made by the State's ballistics expert. Defendant contends that they were immaterial because the angle of the gun in the experiment was not the same as the angle of the gun which shot the decedent.

■ The principle set out in People v. DeWitt, 1950, 98 Cal.App.2d 709, 220 P.2d 981, 986, provides the correct approach to the problem:

"The rule is well established in this state that the admissibility of evidence given in the nature of an experiment lies within the sound discretion of the trial court so long as substantially the same conditions obtain in the experiment as existed in the original act. And there is no abuse of discretion where it reasonably appears that the evidence tends to aid rather than to confuse the jury."

■ The gunshot patterns were introduced at the very end of the trial for the purpose of assisting the jury in its determination of how far away the barrel of the gun was from the body of the victim. Defendant's expert had already testified that the barrel was very close, between

one and two inches, to the body at the time the shot was fired. The State's expert had testified that the barrel was four inches, plus or minus an inch, from the body. We agree that there would be some distortion in the pattern because of the difference in angle—all the experts so testified. The experimental conditions were, however, "substantially similar" to the actual shooting within the limited purpose of demonstrating that the gun was close to the body of the decedent. The trial court did not abuse its discretion in allowing the gunshot patterns to be received in evidence.

The sixth assignment is based on the fact that the lower court allowed the State's expert medical witness to testify that the barrel of the gun which shot the decedent was "close" to the body. Defendant argues that the witness was not a ballistics expert, and should not have been allowed to answer the question.

A close reading of the record discloses that the first time the State's counsel asked the medical expert to testify as to the muzzle distance, an objection was made and upheld. The State then qualified his witness as to his experience with tattooing around gunshot wounds and asked the question again. No objection was made, nor was there a motion made to strike the response. Since proper objection was not taken, the admission of the evidence may not be reviewed upon appeal. Hill v. State, 1917, 19 Ariz. 78, 165 P. 326; State v. Upton, 1946, 65 Ariz. 93, 174 P.2d 622; State v. Eisenstein, 1951, 72 Ariz. 320, 235 P.2d 1011.

The seventh assignment of error refers to questions asked by the State on cross-examination of defendant's ballistics expert. He was asked whether, in his opinion, the State's expert, Ray H. Pinker, was one of the foremost ballistics authorities in the United States or in the Southwest. Defendant's expert responded in the negative to both questions.

Clearly, the question was improper. The scope of the cross-examination of an expert witness can extend no further than questions going to his credibility and to matters in issue on which he has qualified as an expert. 32 C.J.S., Evidence, § 560. In view of the answer given by the witness, however, there was no prejudice to the defendant.

The eighth assignment of error goes to questions asked by the State relating to past imprisonments of the defendant. Defendant admits the well-established rule that an accused who takes the stand in his own behalf may be impeached by interrogation relative to prior convictions of felonies, the nature of the felonies, and the imprisonments therefor. West v. State, 1922, 24 Ariz. 237, 252, 208 P. 412. But it is defendant's contention that the State co-mingled questions relating to imprisonment with questions on other subjects, with the effect that the

evidence was used for more than impeachment, it was used to prove him guilty of the crime for which he was being tried.

We have read the record and find no prejudicial error in either the questions as to imprisonments or alleged insinuations. When a defendant has convictions for felonies in his background and takes the stand, he does so at the risk of having his prior record of such convictions laid before the jury. Hadley v. State, 1923, 25 Ariz. 23, 212 P. 458.

The ninth and tenth assignments go to the admission of testimony concerning unrelated acts of misconduct by the defendant. Defendant contends the State's interrogation was designed to show that the car driven by defendant was stolen and that defendant had lived with a woman who was not his wife.

■ There is no dispute as to the principles to be applied. With certain exceptions, past acts of misconduct which might tend to prove a person's guilt in the case at hand are not admissible. State v. Singleton, 1947, 66 Ariz. 49, 64, 182 P.2d 920, 929. Nor are specific acts of misconduct admissible in this state for impeachment purposes. State v. Harris, 1951, 73 Ariz. 138, 142, 238 P.2d 957, 959.

■ Taking first the matter of the car, defendant argues that the purpose of the State in interjecting the questions was to insinuate that defendant had stolen the car. The State contends that mention of the car had been made on direct examination and that registration of the car was a proper subject of cross-examination. We do not agree. Unless the State could prove that registration of defendant's car was in some way relevant to the charge of first degree murder, the question was improper. The problem is not an important one, however, in view of the fact that after defendant objected, the question was withdrawn. This incident does not constitute reversible error.

The matter of comments and questions on defendant's marital status is more serious. In his opening statement, counsel for the State announced that he was going to prove that Irene Entsminger was not the wife of Andrew Polan. Defendant objected and was overruled. No reason was given as to why it was necessary to prove there was no valid marriage. In the cross-examination of defendant the State asked him whether he had lived with Irene Entsminger before the alleged Indiana common-law marriage. Defendant was also asked when he got married, where the ceremony took place, whether it was in a church, what his idea of a common-law marriage was, whether there was a license, whether there was a record of the marriage, whether there was a preacher or minister, when he started calling Irene Mrs. Polan, and who he told about the marriage.

The State in its brief contends that it was necessary to elicit the marital status between the defendant and Irene in order

to disclaim defendant's contention that the homicide was an accident and to prove motive and intent.

From the time he was arrested defendant insisted that he was married to Irene. In line with the reasoning in the State's brief, this simple fact of marriage would provide ample evidence of motive. And logically, an attempt to prove no marriage would tend to prove lack of motive.

▉▉▉▉▉▉ In any event, we can conceive of no reason why the *validity* of the marriage should have been placed before the jury. The matter was completely collateral. It would seem that the only purpose of parading the circumstances surrounding the common-law ceremony would be to insinuate that defendant was generally immoral and hence would have no qualms about killing Herbert Weight.

Assuming that defendant had, prior to the common-law ceremony, lived in open cohabitation with Irene in violation of an Arizona statute, there is no justification for putting the fact before the jury. This court has very clearly stated, in State v. Harris, supra, 73 Ariz. at page 142, 238 P.2d at page 959, the Arizona rule as to past acts of misconduct:

" * * * The majority of courts will allow on the cross-examination of the witness, specific acts of misconduct not sustained by a conviction to be shown which affect veracity. * * * But this court has allied

Arizona with the minority of states by holding that on cross-examination specific acts of misconduct cannot be shown unless the witness has been convicted of that crime. In other words a mere accusation of a felonious crime is not admissible unless there has been a conviction. * * *"

The test used by this court to determine whether an error is prejudicial is: Had the errors not been committed, is it probable that the verdict might have been different? State v. Singleton, supra. In view of the fact that from the opening statement to the end of the trial the State flaunted the dubiousness of the common-law marriage ceremony before the jury, to the point that at one time there were even snickers from the rear of the courtroom, we feel that the jury might well have returned a different verdict had the matter been excluded.

The Arizona Constitution has guaranteed to everyone a fair trial, and this type of trial cannot be had if highly prejudicial matter is used to secure a conviction. A prosecuting officer acts in a semi-judicial capacity and is required to follow principle alone, without bias or prejudice. Walker v. State, 1921, 23 Ariz. 59, 201 P. 398; Leahy v. State, 1891, 31 Neb. 566, 48 N.W. 390.

The examination relative to the common-law marriage constituted prejudicial error and a new trial must be granted.

Assignment eleven is based on the refusal of the lower court to direct a verdict

for the defendant at the close of the case. The test to be used is set forth in Rule 318, Cr.Proc., Section 44–1835, A.C.A. 1939:

"If, at the close of the evidence for the state or at close of all the evidence in the cause, the court is of the opinion that the evidence is insufficient to warrant a conviction, it may, and on the motion of the defendant shall, direct the jury to acquit the defendant."

The facts set forth at the beginning of this opinion indicate that there was ample evidence to warrant conviction. The lower court was correct in denying the defendant's motion for a directed verdict.

In view of our finding of reversible error it will be unnecessary to discuss assignment twelve, which was a motion for a new trial on the ground that the verdict was the result of passion and prejudice.

Judgment reversed and case remanded for a new trial.

PHELPS, C. J., and UDALL and WINDES, JJ., concurring.

LA PRADE, Justice (dissenting).

I cannot agree with the disposition made of this appeal. The defendant received a fair and impartial trial and the state should not be put to the expense of retrying the case. The majority are of the opinion that had the defendant not been cross-examined concerning the so-called common-law marriage that the jury might well have returned a different verdict. The only different verdict that I can envision is that on retrial the defendant may well receive the death penalty.

When the defendant in a criminal case testifies in his own behalf his veracity and credibility may be tested by cross-examination as other witnesses are tested. 58 Am.Jur., Witnesses, Sec. 687.

The defendant testified that when he stuck his head into the car occupied by Irene Entsminger and the deceased the latter was making sexual advances toward his (Polan's) wife. Defendant wanted the advantage of the unwritten law. He said that he jerked the deceased from the car because of these advances being made on his "wife"; that Weight struck him; that he (Polan) pulled out his gun; that deceased grabbed the gun and in the scuffle the gun was discharged. I think that it was legitimate to cross-examine defendant to learn when, where, and how she became his wife. Prior to going to Indiana he and Irene had lived together here in Phoenix as man and wife, admittedly without having been married, which circumstance was known to their most intimate friends, Mr. and Mrs. Bak, with whom they lived.

The county attorney asked defendant when he got married, to which question counsel objected on the ground that "It has no relevancy to this case whatsoever". The objection was overruled. Defendant was then asked, "In what church?", "Where?".

There was an objection, no reason given, and no ruling by the court. Defendant then testified that it was a "common-law marriage", "by mutual agreement", with no license and no formal ceremony. After this cross-examination defendant's own counsel had defendant explain in detail how he stopped the car in which they were riding, presumably by the roadside, and exchanged vows. To quote defendant:

"I says, 'Irene, if you will take me as your husband', I says, 'Before God, I love you and I have you as my wife. Do you want it that way?', and she says, 'Yes, I want it that way but there is only one thing we have to have', she says, 'Where is my ring?' "

The cross-examination went to a very material point. Had the defendant gone to the rescue of his wife? I think that his marriage relationship was very material. If it was a legal common-law marriage, defendant explained its inception but offered no proof to establish that a common-law marriage was legal in Indiana. When he and Irene returned to Arizona they went to live with their friends, the Baks. Defendant testified that "they" told the Baks of their "marriage"; this Mrs. Bak denied. She testified that they lived at her home as man and wife but she learned that they were not married by overhearing a quarrel in which Irene was demanding that Polan marry her. Mrs. Bak throughout her testimony referred to Irene as "Irene" or "Mrs. Entsminger". At about ten p. m. of the evening preceding the murder Irene had called Mrs. Bak to come and get her and her clothes, saying that "Polan had given her the gate".

Shortly after the murder and within a few minutes after defendant abandoned the deceased at 7th Avenue and Yavapai Street, the defendant and Irene were arrested at 20th Avenue and West Van Buren, driving defendant's car. When accosted by police officers defendant denied knowing anything about a killing and this one in particular. At this time Irene identified herself to the officers as "Irene Entsminger".

In my mind this cross-examination was legitimate and warranted. The defendant's veracity and credibility were in issue. The jury by its verdict placed no credence in anything the defendant said.

Assuming that this cross-examination was erroneous, was it prejudicial?

The jury did not convict defendant because he had or had not lied about his claimed marriage. This feature of the case was completely overshadowed by the fact that the jury believed that the defendant, on learning that Irene was with a man, became enraged and told Mrs. Bak, "I will kill the son-of-a-bitch that is with her". After this statement he returned to his motel and secured his gun and, while flashing the gun in the presence of his landlord, said, "I will get that son-of-a-bitch". After getting the gun and within a few minutes defendant returned to the Bak residence where like statements were made. While he was wait-

264

ing and parading up and down the street, Irene and the deceased drove up. This event occurred within thirty minutes after Irene had met Weight, a pickup stranger.

When Weight drove up defendant rushed across the street to the car and, according to Mrs. Bak whose narration is as follows:

"From where I was standing he just yanked him out. Then I heard Mr. Weight say to him, 'I am sorry, I didn't know. I don't want no trouble', and then I heard a gun shot and saw the man stumble."

All the state's evidence, which was believed by the jury, shows a clear case of a wilful and deliberate murder. The jury believed the police officers and disbelieved everything the defendant said, including his recitation of the facts of his claimed common-law marriage. This marriage story sank into insignificance in the face of all of defendant's lying on the material facts of the killing and his disavowal of knowing anything about it when first arrested. I can't conceive of the cross-examination being substantially prejudicial to this two-time loser whom the jury branded as a liar and a murderer.

Our constitution commands that no criminal case shall be reversed when upon the whole case it appears that substantial justice has been done. Const. Art. 6, Sec. 22.

The reversal of this conviction, in my judgment, constitutes a miscarriage of justice.