290 P.2d 470

STATE of Arizona, Appellee,

v.

Alvin Clarence THOMAS, Appellant.

No. 1073.

Supreme Court of Arizona.

Nov. 22, 1955.

Benjamin Lazarow, Lawrence Ollason, Tucson, for appellant.

Robert Morrison, Atty. Gen., L. Alton Riggs, Sp. Asst. Atty. Gen., for appellee.

PHELPS, Justice.

Appellant, Alvin Clarence Thomas, was informed against in count one of the information, tried, and convicted of the crime of committing a lewd and lascivious act upon the person of the prosecutrix and in count three thereof he was charged and convicted of the crime of contributing to the delinquency of certain minors, and sentenced to be punished by imprisonment in the state prison for a period of 18 months for the offense charged in count one, and for a period of one year in the county jail for the offense charged in count three, the sentences to run concurrently. Count two of the information was dismissed. The minors' names for obvious reasons will be withheld and the complaining witness will hereinafter be referred to as the prosecutrix. Alvin Clarence Thomas will be referred to as the defendant and the state of Arizona as the state. A number of witnesses who are also minors will be designated otherwise than by the use of their names.

On the 27th day of June, 1954, defendant was motoring into Tucson, Arizona, and picked up four hitchhikers: prosecutrix, another girl (her companion), and two Davis-Monthan Air Force Base airmen. He took them to his home on Oracle Road in Tucson, where the visitors were given the run of the premises. With defendant's permission, and at his suggestion, the girls and the airmen helped themselves to the contents of defendant's refrigerator and all consumed some beer which they found therein.

Between the 27th day of June and the 15th day of July, the prosecutrix visited the defendant on a few other occasions at his home and testified that on at least three of these occasions the defendant performed an abnormal act of lewd and lascivious conduct with the prosecutrix known as cunnilingus.

The last occasion for this specified act by the defendant upon the person of prosecutrix is claimed to have been performed in the early morning hours of July 15, 1954. On this occasion, upon receiving a telephone call from the companion of the prosecutrix, she and the prosecutrix were taken to the defendant's home by one Sonny Etier, a guest of the defendant, who drove the defendant's automobile to pick up the prosecutrix at approximately 2:00 a. m. Present on this occasion were defendant,

Etier, the prosecutrix and two other girls, both of whom were minors.

Defendant did not meet the visitors but prosecutrix went down the hall. She testified that she entered his bedroom and had abnormal sexual relations with him. While she was thus engaged, the others remained in the dining room and played cards. Prosecutrix came into the living room and defendant soon followed. Defendant gave prosecutrix and her companion a sizeable amount of food from his refrigerator and gave Mr. Etier a large bill, and instructed him to cash the same in order to give to prosecutrix and her companion some money, which was subsequently done. Mr. Etier then took the two girls to their home.

[1] The principal ground for this appeal is that defendant was convicted under count one upon the testimony of an accomplice without sufficient corroboration. Count one of the information under which defendant was convicted is based upon section 43–407, A.C.A.1939, which provides that:

"Any person who shall wilfully commit any lewd or lascivious act upon or with the body of (or) any part or member thereof, of any male or female person, with the intent of arousing, appealing to or gratifying the lust or passion or sexual desires of either of such persons, in any unnatural manner, shall be guilty of a felony and imprisoned not less than one (1) year nor more than five (5) years."

The state has produced only one witness who testified to the defendant's having committed such an act. This was the prosecutrix, with whom the act is alleged to have been committed. If she participated in the act without fear or duress, her conduct would come within the contemplation of the act. Under such circumstances she would be guilty of violating this section and a conviction could have been sustained against her under its provisions. Her testimony indicated that she consented to the act and therefore she was an accomplice. The test of whether or not one is an accomplice is whether he could be informed against for the same crime of which the defendant is accused. State v. Green, 60 Ariz. 63, 131 P.2d 411; State v. Miller, 71 Ariz. 140, 224 P.2d 205.

Section 44–1819 provides that:

"A conviction can not be had on the testimony of an accomplice, unless he is corroborated by other evidence which, in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense, or the circumstances thereof."

The court properly instructed the jury in accordance with this section and added:

"* * * The corroborating evidence need not be sufficient in itself to establish the defendant's guilt, and need not be by direct evidence. The

entire conduct of the defendant may be looked to for corroborating circumstances, and, if from those circumstances his connection with the crime may be fairly inferred, the corroboration is sufficient."

We stated in Kingsbury v. State, 27 Ariz. 289, 232 P. 887, 891, quoting from Reynolds v. State, 14 Ariz. 302, 127 P. 731, that:

" 'The corroborating evidence must, of itself, and without the aid of the testimony of the accomplice, tend, in some degree, to connect the defendant with the commission of the offense. It need not, of course, be sufficient to establish his guilt; for, in that event, the testimony of the accomplice would not be needed. But it must tend, in some * * * degree at least, to implicate the defendant. The purpose of the statutes was to prohibit a conviction, unless there was some evidence, entirely exclusive of that of the accomplice, which, of itself, and without the aid of the accomplice, tended to raise at least a suspicion of the guilt of the accused.' "

The Kingsbury case was later reversed on rehearing upon other grounds.

In this case the only evidence we have that a lewd and lascivious act was committed by the defendant is the testimony of the prosecutrix, who as above stated, is an accomplice. The only other evidence upon this fact is that the prosecutrix, on the night in question, went down the hall toward the bedroom which the defendant was occupying. There were three other bedrooms and two bathrooms, a dining room and kitchen down the hall. No one saw her enter the bedroom; no one saw her come out of it. Another girl who was left in the living room testified that prosecutrix was gone from the living room for a few minutes, "not very long." She also testified that she, Sonny Etier, the prosecutrix and her companion were not in the defendant's residence more than twenty or thirty minutes, although she could not state the time exactly. This is considerably at variance with the testimony of the prosecutrix, who estimated the time to be between two or three hours. This testimony, in the absence of some showing that she was actually in the bedroom with the defendant is insufficient to show an opportunity to commit even an ordinary act of sexual intercourse. The trial court erred in failing to grant defendant's motion to dismiss count one of the complaint on the ground that there was a lack of corroboration of the testimony of the accomplice. This error was prejudicial and the judgment as to count one of the information must be reversed upon this ground.

Having found reversible error as to defendant's conviction under count one of the information, we shall discuss defendant's other assignments of error in the light of their applicability to the conviction under count three of the information.

■ Defendant assigns as error the refusal of the court to permit him to cross-examine one of the witnesses, also a minor, whom we shall designate as witness A, on all phases of the case. When counsel asked permission to cross-examine the witness the court instructed him that the defendant may cross-examine the witness on all matters gone into on direct examination or any matter within the knowledge of the witness that might have a bearing on the issues of the trial. This was a correct statement of the Arizona rule as set forth in Podol v. Jacobs, 65 Ariz. 50, 173 P.2d 758. The defendant then sought to bring before the jury on cross-examination a statement from the witness to the effect that the police department of Tucson, specifically Chief Hays, had coerced her into making false statements incriminating the defendant. The court sustained an objection to this evidence. Counsel claims this was a denial of a substantial right of the defendant and was very prejudicial to him. The alleged false statement of the witness never reached the ears of the jury. It knew nothing of its existence. The witness testified to nothing in the presence of the jury that tended to implicate defendant in the offense charged. Defendant was therefore not entitled to parade before the jury something it knew nothing about in order to permit the witness to state it was false and that she was coerced into making it. The court correctly sustained an objection to its admission.

■ The defendant further claims prejudicial error was committed by the court in permitting the state to show that in March, 1953, defendant had married a 16-year-old girl which marriage her parents had annulled one day later. The question concerned a matter in no way related to the guilt or innocence of the defendant on either counts one or three and should not have been permitted, but applying the test laid down in the case of State v. Polan, 78 Ariz. 253, 278 P.2d 432, to the effect that if the verdict would probably have been the same had the error not been committed, such error will not require a reversal of the judgment. It is our opinion that the admission of the testimony concerning the marriage in no way affected the verdict reached by the jury on count three and is therefore not reversible error. The evidence is overwhelming in support of the charge of contributing to the delinquency of the minors involved. Nothing short of a violation of the oath of the jurors could have resulted in an acquittal.

■ There is no merit whatever to defendant's assignment of error based upon the state's cross-examination of one of its witnesses whom we shall designate as witness B and by whom counsel for defendant had attempted to prove defendant's good moral character. The state had a perfect right under such circumstances, and it was its duty, to ascertain upon what she based her answer that defendant was of good moral character and it had the right in so

doing to ascertain the names of those with whom she had discussed his general reputation for good morals in order to ascertain if she was qualified to testify as to his general reputation for morality. Wharton"s Criminal Evidence, 12th ed., Examination of Witnesses, Sec. 865, pp. 246 to 257 inclusive; also Underhill on Criminal Evidence, 4th ed., Sec. 172, pp. 302 to 305 inclusive. The cross-examination demonstrated that she possessed no such qualification.

Defendant also claims reversible error committed by the court in permitting the state to impeach the same witness to whom reference is made above. This assignment of error is based upon the cross-examination of said witness touching upon her qualifications to testify to the general reputation of the defendant for good moral character. The examination of the witness bears no resemblance to impeachment. It was simply cross-examination which the state had the right to pursue both as a matter of right and under the express permission of the court. There is a wide difference between impeachment and cross-examination. State v. Lane, 69 Ariz. 236, 211 P.2d 821.

■ Defendant further contends that the court erred in refusing to grant his motion for a continuance filed on December 27, 1954, on account of the inability of a non-resident witness, Orin Dellsperger by name, to be present at the trial which the records show was held on March 9th. On the same date (December 27) a motion was made by counsel for defendant to take the deposition of the same witness. Apparently none was ever taken. Defendant had ample time to procure Dellsperger's deposition. He didn't do it. He cannot complain now that he was erroneously deprived of his testimony in the case.

. Judgment of the trial court as to count one is reversed and affirmed as to count three.

WINDES and STRUCKMEYER, JJ., concur.

LA PRADE, Chief Justice, and UDALL, Justice (dissenting in part).

We concur in the affirmance of the judgment of conviction as to count three. However, we are unable to agree with the reversal as to the felony, count one, and therefore dissent as to this portion of the decision.

It is our view that "other evidence" which is hereinafter summarized, sufficiently corroborates the testimony of the prosecutrix in tending "to connect the defendant with the commission of the offense". At the outset it seems to us that the majority has failed to consider the evidence in a light most favorable to a sustaining of the judgment of conviction. We submit there is no special rule governing the matter of corroboration in crimes involving lewd and lascivious acts or sex offenses, either natural or unnatural. The majority concede that the trial court

properly instructed the jury as to the law governing the requirement for corroboration of an accomplice. According to our previous decisions such corroboration may be circumstantial and no particular testimony of the accomplice need be corroborated. Hence the fact that no one else testified the prosecutrix was actually in defendant's bedroom on the night in question does not of itself indicate her story lacked corroboration.

Justice Pound, speaking for the state's highest court, in the case of People v. Dixon, 1921, 231 N.Y. 111, 131 N.E. 752, 754, stated:

" * * * The 'other evidence' must be such 'as tends to connect defendant with the commission of the crime.' The corroborative evidence need not show the commission of the crime; it need not show that defendant was connected with the commission of the crime. (Citing cases.) It is enough if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the accomplice is telling the truth. The corroboration is not restricted to any particular point. Its connection with defendant's own statements and denials should be considered. (Citing cases.) It may vary in its nature according to the circumstances of the particular case. Matters in themselves of seeming indifference or light trifles of the time and place of persons meeting may so harmonize with the accomplice's narrative as to have a tendency to furnish the necessary connection between defendant and the crime. * * *"

This court, in the famous "Ouija board" case of Turley v. State, 48 Ariz. 61, 78, 59 P.2d 312, 319, on the point of corroboration held:

"*That a crime,* with intent to murder, *had been committed was clearly proven by the testimony of Mattie Turley herself,* (defendant's daughter and the challenged accomplice) and this, of course involved the question of whether she alone was guilty of the offense, or whether she had an accomplice (i. e. her mother the defendant)." (Emphasis and insert supplied.)

Further in the opinion is found a quotation from Reynolds v. State, 14 Ariz. 302, 127 P. 731, wherein it is stated that if the corroborating evidence tended " 'in some slight degree at least, to implicate the defendant' " or raise " 'at least a suspicion of the guilt of the accused' " it was legally sufficient.

Wigmore, in his monumental work on Evidence, 3d Edition, Vol. 7, devotes many pages (312 to 406) to a discussion of "Required Corroboration". He traces the development of the law on this matter from the early "counsel of caution" given to juries by the courts until now one-half of the jurisdictions in the United States (Arizona included) have turned this cau-

tionary instruction into a rule of law. The author quotes with approval (1) from Chief Baron Joy, Evidence of Accomplices:

"* * * *_The defect in the evidence is not in its 'quantity', but in its 'quality'. The witness swearing directly to the prisoner's guilt, that guilt is established if the witness be credible._* What, therefore, is required is to throw something, no matter of what nature, into the opposite scale, which will serve as a counterpoise to the impeachment of the witness' credit arising from the character in which he appears; something that will improve the 'quality' of the proof which has been given by the accomplice; and 'that' something may be anything which induces a rational belief in the mind of the jury that the narrative of the accomplice is in all respects a correct one. * * *" (Emphasis supplied.) (Wigmore, Vol. 7, Sec. 2059, p. 328),

and (2) sets forth what he terms an ideal instruction given by an early English judge:

"'It may not be unfit to observe to you here that the confirmation to be derived to an accomplice is not a repetition by others of the whole story of the accomplice and a confirmation of every part of it; that would be either impossible or unnecessary and absurd; * * * and therefore you are to look to the circumstances to see whether there are such a number of important facts confirmed as to give you reason to be persuaded that the main body of the story is correct * * *. You are, each of you, to ask yourselves this question: Now that I have heard the accomplice and have heard other circumstances which are said to confirm the story he has told, does he appear to me to be so confirmed by unimpeachable evidence, as to some of the persons affected by his story or with respect to some of the facts stated by him, as to afford me good ground to believe that he also speaks the truth with regard to other prisoners or other facts, with regard to which there may be no confirmation? Do I, upon the whole, feel convinced in my conscience that his evidence is true and such as I may safely act upon?'" Ibid.

The law just cited is, in our opinion, in harmony with the spirit of previous pronouncements of this court. Bearing in mind these principles we feel impelled to set forth a résumé, in narrative form, of the testimony of prosecutrix and other witnesses in the case in order that the whole picture may be presented. In our opinion the overall testimony, as a matter of law, sufficiently corroborates the testimony of the prosecutrix so as to sustain the trial court in submitting the felony count to the jury. (Note: Where the testimony of a minor is involved we shall only use her first name. Age given is as of the date of the occurrence.)

### Pat (Prosecutrix), age 17

Married in March, 1954; went with husband to Idaho; divorced; returned to Tucson in June; lived with grandmother couple of days; then lived with another girl named Robin.

Met Thomas on June 27th, at time Thomas picked up the two girls and two soldiers. Thomas took them to his home, had watermelon, ice cream and soft drinks. Thomas gave them the run of the house; had food and beer around the swimming pool. This was an afternoon party. Left about dusk. She was "high". Thomas took them to town where they picked up Toni. Thomas drove them to a theatre and let them out—that is, the two soldiers, Robin, and Pat. Thomas then drove away with Toni. Before leaving Thomas gave Robin $5.

Said that on the afternoon of the swimming party arrangements were made for her and Robin to come back two days later and clean the house. She and Robin went out two days later (the 29th). They hitchhiked there. No one was home when they got there. They entered through a side door, washed off the porch and washed windows. Thomas came home after they had been there about an hour. They also washed dishes. This took about a half hour. She and Robin engaged Thomas in conversation in the bedroom and in the shower.

On June 29th at the time Thomas came home he found the girls cleaning house, both girls naked except for towels around breasts and hips.

Testified that Thomas propositioned the two of them to have unnatural acts with him. "We told him no—he said he would give us $20."

Thomas then took them home, giving each girl $10. He asked them to come back and clean the house.

The two girls returned on July 10th. Robin called Thomas on the phone. Thomas came after them in a car. They straightened up the house a little bit, washed dishes, ate sandwiches. Thomas propositioned the two of them again. Thomas offered to give them $20. "I told him no a couple of times and—I said, yes." Thomas told her to take a shower and undress, retired to his bedroom, etc. Act took 5 to 10 minutes. Witness dressed, Thomas gave her $20. He then took them home. Thomas told them to come back again. She returned the next day. Sonny (defendant's "man Friday") came after her in Thomas's car. It was the afternoon of the 11th. Had sandwiches and cokes. Sonny left to get car greased. Thomas kept telling her to hurry up. "He thought I was a hot mama." She took shower, undressed, retired to the bedroom. Thomas gave her $20. Act took 5 to 10 minutes. While this act was going on the phone rang. It was Toni. Thomas told her to grab a cab and come out. On coming out of the bedroom Sonny, Toni and Anita arrived. Sonny took her home—4 or 5 p. m. Toni and Anita went into bedroom.

Returned again to Thomas's home between about 2 and 3 a. m. on the morning of the 15th (date of alleged offense). This meeting was arranged by Robin who called over the telephone ostensibly about loss of billfold. In response to this call Sonny and Virginia came, picked them up at service station at Congress and Freeway. Thomas was home when they arrived. Sonny took the two of them into a back bedroom—Thomas came out of a side bedroom—Thomas had on pajamas and robe. She took a shower, got undressed, repeat performance. The act took 5 or 10 minutes. Thomas told her that Sonny would pay her. Sonny took her, Robin and Virginia home in Thomas's car.

Pat testified that the morning of the 15th she was at the premises two or three hours.

"Q. How long did this whole thing take, from the time you were out there? A. I don't know—it could have been two hours, three hours."

Defendant's counsel on cross-examination of Pat:

"Q. Now isn't it true that Sonny went to the Desert Inn somewhere and tried to cash a bill? A. That was before.

"Q. How much did Sonny give you? A. Ten dollars."

Virginia, age 17

Testified she met defendant when she was employed in a drug store at the Santa Rita Hotel. She lived for a few weeks at Thomas's home, with a Jackie Douglas and her husband, friends of Thomas.

Stated that she knows Pat and Toni; that she had seen the girls at Thomas's home on a few occasions; that she had seen the girl Anita with Thomas and Toni; that she knows Sonny. She identified Sonny as a disc jockey for Thomas. Said that she had seen Sonny at Thomas's house; saw Sonny drive Thomas's car.

Testified that early in the morning of July 15th she went with Sonny to deliver Toni and Anita downtown. After delivering these girls they picked up Pat and Robin. This was some time after midnight. When they returned to the house, that is, Sonny, Pat and Robin, she did not see Thomas. She thought he was in bed. She testified that Pat left the living room and went into the long hall from which leads four bedrooms and two bathrooms. She estimated the girl was gone fifteen or twenty minutes; that she came back to the room; that Thomas came into the room; that she and Sonny were playing cards and Robin was watching; that Thomas inquired what they were doing there; that Thomas had on a robe; that she and Sonny then took the girls downtown and stopped at the Desert Inn to change a bill or something. That he came out of the Inn—gave Pat and Robin money. Thereafter she and Sonny went to Nogales somewhere around 4 a. m.

### Toni, age 17

Knows defendant Thomas well and has dated him.

Denied that she ever had actual sexual intercourse with defendant or that he had ever attempted any unnatural sexual advance.

Admitted that at the time she was arrested she had given a written statement that she had had intercourse with defendant and that she had resisted defendant's attempt to have an unnatural act with her. Claims she made the written statement to get out of jail.

Says she knows Pat (the prosecutrix) and that she met her on June 27th. Was introduced by Thomas at the time Thomas had the two girls and two soldiers in the car, together with the girl Robin. She got in the car and drove downtown when the other four passengers got out. This was about 7 or 8 o'clock in the evening, when Thomas was taking the two girls and two boys home from the afternoon party at his house. About three weeks later she saw Pat at defendant's home. She and Anita went out. Witness had called Thomas and told him she was coming out. He told her to grab a cab and come on out. When they arrived Sonny and Pat were there. Sonny left with her very shortly after their arrival.

### Anita, age 14

This witness knows the girls, Pat, Robin and Virginia.

Admitted she had been at Thomas's home but could not remember number of times. Said she saw Pat there once. At the time she saw Pat there she and Toni had gone out in a taxi. This was some time in July. Said "fat boy" (also known as Sonny) was also present. This was a night time visit.

### Defendant Thomas

Testified he was 63 years old—lived at 4619 Oracle Road.

Denied that he had committed the acts with Pat as testified to by her.

Admitted that Pat and Robin were at his home on several occasions in June and July.

Admitted that Sonny brought the girls to his house in the early morning hours of the 15th of July; that they were at the house on this occasion ten or fifteen minutes; that he picked the girls up and took them to the house on the first occasion; admits that they came out and cleaned the house on two occasions; that he gave the girls money on several occasions.

On cross-examination:

"Q. And you instructed Sonny to give them money on at least one occasion, did you not? A. Yes."

Admits that he gave them $10 on two or three occasions, and that he felt sorry for them as they were broke.

"Q. On one occasion he (referring to Sonny) had a check cashed so he

could give them some money for you? Is that right? A. A $100 bill, yes."

Denies that he ever gave Toni any money.

We submit that the entire circumstances were before the jury and that they laid the foundation and the corroboration for several material elements of the testimony of the prosecutrix. With this overall picture before them as related by the witnesses, the jury could well conclude that all these young girls were repeatedly at defendant's home, at all hours of the night and day, with his consent and knowledge, and that he was repeatedly plying them with money. They could and obviously did believe the testimony of prosecutrix that the crime charged was committed. Pat testified that she went to the bedroom and performed the act with the defendant, that the defendant promised to pay her, and that this payment would be made by the henchman Sonny. Sonny did make the payment in the presence of Virginia, as testified to by her. Defendant himself admitted that he instructed Sonny to make this payment. This phase of the testimony of itself is legally sufficient corroboration. Defendant would have the jury believe that the payment was made because he was sorry for the girls. The jury was entitled to draw any conclusions it desired that were inferable from the entire background of the recorded testimony. The jury did not have to believe defendant's testimony that he caused the payment to be made for altruistic reasons, and the verdict would indicate the jury did not believe it. Other testimony, without contradiction, corroborates Pat's statement that she and the other two girls were at defendant's home in the wee small hours of the night in question when this alleged offense occurred, brought there and returned home in defendant's car by his man Sonny. The disparity of age between defendant and the prosecutrix was in itself bodeful, a factor the judge and jury were entitled to consider.

It should be remembered that:

"Under the statutory rule, the sufficiency of the evidence as satisfying the definition of the rule of law is of course for the judge, while its effect as actually making the accomplice's testimony trustworthy is for the jury." Wigmore, Evidence, supra, Sec. 2059, p. 334.

With the above evidence before it we think the trial court very properly permitted the felony count to go to the jury.

We would affirm the conviction as to both counts.